## IN THE COURT OF CRIMINAL APPEALS OF TENNESSEE

### AT JACKSON

**JUNE SESSION, 1999**



**FILED**

September 1, 1999

Cecil Crowson, Jr.
Appellate Court Clerk

| | |
|---|---|
| **GAILE K. OWENS,** )<br><br>    **Appellant,** )<br><br>**vs.** )<br><br>**STATE OF TENNESSEE,** )<br><br>    **Appellee.** ) | **No. 02C01-9806-CR-00182**<br><br>**SHELBY COUNTY**<br><br>**Hon. Chris Craft , Judge**<br><br>**(Post-Conviction, Capital Case)** |

For the Appellant:

**Paul J. Morrow, Jr.**
Staff Attorney
Post-Conviction Defender
460 James Robertson Parkway
2nd Floor
Nashville, TN  37243-0505

For the Appellee:

**Paul G. Summers**
Attorney General and Reporter

**Michael E. Moore**
Solicitor General

**Alice B. Lustre**
Assistant Attorney General
Criminal Justice Division
425 Fifth Avenue North
2d Floor, Cordell Hull Building
Nashville, TN 37243-0493

OPINION FILED: _____

AFFIRMED

**David G. Hayes**, Judge

**OPINION**

In this capital case, the appellant, Gaile K. Owens, appeals as of right the judgment of the Criminal Court of Shelby County denying her petition for post-conviction relief. In 1986, the appellant was convicted of accessory before the fact to first degree murder. In a joint trial, the appellant's co-defendant, Sidney Porterfield, was also convicted of first degree murder and following a separate sentencing hearing, both were sentenced to death by electrocution. The appellant's conviction and sentence were affirmed on direct appeal by the Tennessee Supreme Court. See State v. Porterfield, 746 S.W.2d 441 (Tenn.), reh'g denied, (1988), cert. denied, 486 U.S. 1017, 108 S.Ct. 1756 (1988).

The appellant filed the instant petition on February 28, 1991. The post-conviction court denied the appellant's ex parte request for expert services. Through an interlocutory appeal to the Tennessee Supreme Court, the appellant was granted the funds for expert services. See Owens v. State, 908 S.W.2d 923 (Tenn. 1995). An amended petition was filed on August 15, 1996. A hearing was held on September 22, 1997. On May 4, 1998, the post-conviction court entered an order denying the appellant post-conviction relief.

On appeal, the appellant raises the following issues:

I. Whether the appellant received the effective assistance of counsel at trial;

II. Whether the judge at the post-conviction proceeding, formerly an assistant district attorney who worked in the office which tried the appellant, should have recused himself;

III. Whether the appellant was denied her constitutional rights during the guilt and sentencing phases by the prosecution's failure to provide the defense exculpatory evidence;

IV. Whether the heinous, atrocious, and cruel aggravator was appropriately applied vicariously to the appellant and whether the trial court should have instructed that the appellant intended to inflict the

2

heinous, atrocious, and cruel act;

V. Whether the murder for remuneration aggravating circumstance sufficiently narrows the class of death eligible offenders;

VI. Whether the reasonable doubt jury instructions given at both stages of the trial were constitutional; and

VII. Whether Tennessee's death penalty statutes are constitutional.

After reviewing the record, we affirm the judgment of the post-conviction court.

## Background

The proof, as set forth in the supreme court's decision, State v. Porterfield, 746 S.W.2d at 443-445, established the following pertinent facts:

The evidence shows that over a period of months, Mrs. Owens solicited several men to kill her husband. One of these men was Sidney Porterfield. She met with him on at least three occasions, the last being at 2:30 p.m. on Sunday, February 17, 1985. At that time, she told him that her husband would either be home alone that night or would be at the church playing basketball.

That evening Mr. and Mrs. Owens and their two sons attended evening church services. Afterwards, when Mr. Owens remained at church to play basketball, the boys asked, as they usually did, to stay with their father. Mrs. Owens refused their request and took them to a restaurant for dinner and then to the home of Mrs. Owens' sister, where they stayed until approximately 10:30 p.m. When they arrived home at about 11:00 p.m. Mr. Owens' automobile was in the driveway. The doors were open, the interior light was on and Mr. Owens' coat and tie were on the seat. They found the back door to the house partially open, and the keys in the lock. There were signs of a struggle in the kitchen and blood was splattered on the wall and floor. Mr. Owens was found in the den unconscious, his head covered with blood. Mr. Owens died some six hours later from multiple blows to his head.

The autopsy revealed that Mr. Owens had been struck at least twenty-one times with a blunt instrument, described by the forensic pathologist as a long, striated cylinder such as a tire iron. The blows had driven his face into the floor, crushed his skull and driven bone fragments into his brain. Mr. Owens also had sustained extensive injuries to his hands and strands of hair between his fingers indicated he had been covering his head with his hands when he was beaten.

After the killing, George James, one of the men solicited by Mrs. Owens to kill her husband, contacted the police and told them of Mrs. Owens' offer. James then assisted the police by permitting them to record telephone conversations he had with Mrs. Owens. After one of

the calls, James met Mrs. Owens in the Raleigh Springs Mall in Memphis. James was wearing a hidden body microphone, which was being monitored by police in a nearby automobile. Mrs. Owens paid James sixty dollars to keep quiet, telling him that it was all the money she had. She also stated that she had had her husband killed because of "bad marital problems." Mrs. Owens was placed under arrest at the conclusion of her meeting with Mr. James.

At first, Mrs. Owens claimed that she only had hired people to follow her husband and "to rough him up." She did admit paying out some $ 4,000 to $ 5,000 to various men for expenses. Later she confessed to offering three men $ 5,000 to $ 10,000 to kill her husband and to talking with a man known as "little Johnny" at 2:30 p.m. on the day of the murder about killing her husband. She had promised to pay him three or four days after the murder. When asked why, Mrs. Owens stated, "We've just had a bad marriage over the years, and I just felt like he had, mentally I just felt like he had been cruel to me. There was very little physical violence."

The man who met Mrs. Owens on Sunday afternoon was identified by witnesses as Sidney Porterfield. A witness also placed Mr. Porterfield in the vicinity of the Owens' house a week before the killing.

Mr. Porterfield also made a statement to the police which was entered into evidence. According to Mr. Porterfield, he met with Mrs. Owens on three occasions to discuss plans for the killing of Mr. Owens, the last being at 2:30 p.m. on Sunday, February 17, 1985. He stated that Mrs. Owens offered him $ 17,000 to kill her husband, and that he told her he would have to check out the situation. (Shortly after her husband's funeral Mrs. Owens had asked her father-in law for $ 17,000 "to pay some bills.") He further stated that he went to the Owens' house that evening at about 9:00 p.m. On leaving his automobile, he put a tire iron in his pocket in case he encountered a dog. Porterfield stated he was walking in the back yard of the Owens' house when Mr. Owens came home; that Mr. Owens would not accept his explanation that he was looking for a house, but informed him he was going to hold him until the police arrived; that Mr. Owens grabbed him by the arm and attempted to pull him into the house. According to Porterfield, Mr. Owens had a brief case in one hand and was grasping Porterfield with the other. (No attempt was made to explain how Mr. Owens, with his hands thus occupied, unlocked the door to the house.) Porterfield said he tried to break away and, when he was unsuccessful, struck Mr. Owens with the tire iron. The men were then in the kitchen. Mr. Owens threw his hand up for protection, but would not release Mr. Porterfield. Porterfield then continued to strike Mr. Owens with the tire iron, with the result that he did extensive damage to both of Mr. Owens' hands and to his head. On leaving the Owens' house, Mr. Porterfield threw the tire iron and the gloves he was wearing into a dumpster. They were never recovered.

Defendant Porterfield offered no evidence in his defense. Mrs. Owens presented the testimony of a neighbor, who testified that Mrs. Owens was almost hysterical after her husband was found. A funeral home employee also testified. He stated that a large balance was owing on Mr. Owens' funeral bill, presumably to show that Mrs. Owens did have large debts to pay after her husband's death as she had represented to her father-in-law in attempting to secure a loan.

4

. . .

In the bifurcated sentencing hearing, the forensic pathologist again testified for the state concerning the circumstances of Mr. Owens' death, such as blood being inhaled, bone fragments being driven into his brain, and the fact that Mr. Owens had lived six hours after the beating.  Two photographs showing the head wounds suffered by Mr. Owens also were introduced.

In addition, the state presented proof that Mr. Porterfield had been convicted of robbery with a deadly weapon in 1968 and of simple robbery twice in 1971.  The state also relied on the circumstances of the killing as shown by evidence in the guilt phase of the trial.

In mitigation, the defendant Owens presented evidence that she had been treated by a psychiatrist on one occasion in 1978 for severe behavioral problems. She also called two jail employees who testified that Mrs. Owens was a good prisoner who caused no problems, volunteered to work, and attended Bible study classes. Mr. Porterfield presented no evidence in mitigation.

In imposing the sentence of death, the jury found three aggravating circumstances with respect to Porterfield, and two with respect to Mrs. Owens. No mitigating circumstances were found. Specifically, the jury found that Mr. Porterfield (1) had been previously convicted of one or more felonies involving the use or threat of violence to the person; (2) that he committed the murder for remuneration or the promise of remuneration, or employed another to commit the murder for remuneration, or the promise of remuneration; and (3) that the murder was especially heinous, atrocious, or cruel in that it involved torture or depravity of mind. *See* T.C.A. §§ 39-2-203(i)(2), (4) and (5). The jury found the same aggravating circumstances in sentencing Mrs. Owens, except for the finding of previous conviction of a felony involving the use or threat of violence to the person.

### Post-Conviction Hearing

In post-conviction proceedings, the appellant must prove the allegations contained in her petition by a preponderance of the evidence.[1]  State v. Kerley, 820 S.W.2d 753, 755 (Tenn. Crim. App.), perm. to appeal denied, (Tenn. 1991). Findings of fact and conclusions of law made by the post-conviction court are given the weight of a jury verdict, and, this court is bound by those findings unless the evidence contained in the record preponderates otherwise.  Butler v. State, 789 S.W.2d 898, 899 (Tenn. 1990).  This court may not reweigh or reevaluate the

---

[1]Again, the appellant's petition for post-conviction relief was filed on February 28, 1991. Because it was filed prior to May 10, 1995, it is governed by Tenn. Code Ann. § 40-30-101 et seq. (repealed 1995), rather than the revised Post-Conviction Procedure Act, Tenn. Code Ann. § 40-30-210 et seq. (1997).  Under the current statute, the standard is "clear and convincing evidence." Tenn. Code Ann. § 40-30-210(f).

evidence or substitute its inferences for those drawn by the post-conviction court. Questions concerning credibility of witnesses and the weight and value to be given their testimony are for resolution by the post-conviction court. Black v. State, 794 S.W.2d 752, 755 (Tenn. Crim. App. 1990).

## I. Ineffective Assistance of Counsel

The appellant contends that she was denied effective representation of counsel at trial due to counsel's failure to: (1) adequately investigate a death penalty case; (2) properly request expert services; 3) request investigative assistance; (4) appropriately manage the trial testimony of Dr. West; and (5) request a continuance, which would have been automatic, when the State failed to comply with the notice provisions regarding aggravating circumstances.[2]

## A. Standard for Determining Ineffective Assistance of Counsel

When a claim of ineffective assistance of counsel is raised, the burden is upon the appellant to show (1) that counsel's performance was deficient and (2) that the deficient performance prejudiced the defense. Strickland v. Washington, 466 U.S. 668, 687, 104 S.Ct. 2052, 2064 (1984). Thus, the appellant must prove that counsel "made errors so serious that counsel was not functioning as the 'counsel' guaranteed the defendant by the Sixth Amendment," and the appellant must demonstrate that counsel's errors "were so serious as to deprive the defendant of a fair trial, a trial whose result is reliable." Id. The appellant must establish both deficient performance and prejudice in order to prevail. Id. A reviewing court need not consider the two prongs of Strickland in any particular order. Strickland v. Washington, 466 U.S. at 697, 104 S.Ct. at 2069. Moreover, if the appellant fails to

---

[2]In other sections of her brief, the appellant claims ineffective assistance of counsel for failure (1) to object to the murder for hire aggravating circumstance, (i)(4), as double enhancement; (2) to object to the vicarious application of the heinous, atrocious, and cruel aggravating factor; and (3) to request a clarifying instruction regarding intent to inflict serious physical abuse in the (i)(5) aggravating circumstance. See infra, Section IV, "Vicarious Application of the Heinous, Atrocious, and Cruel Aggravator" and Section V, "Unconstitutional Duplication of the Remuneration Aggravator" for review of these issues.

establish one prong, a reviewing court need not consider the other. Id.

With respect to deficient performance, the proper measure of attorney performance is reasonableness under prevailing professional norms. Strickland v. Washington, 466 U.S. at 688, 104 S.Ct. at 2065. In other words, the attorney's performance must be within the range of competence demanded of attorneys in criminal cases. Baxter v. Rose, 523 S.W.2d 930, 936 (Tenn.1975). This court "must indulge a strong presumption that counsel's conduct falls within the wide range of reasonable professional assistance; that is, the defendant must overcome the presumption that, under the circumstances, the challenged action 'might be considered sound trial strategy.' " Strickland v. Washington, 466 U.S. at 689, 104 S.Ct. at 2065. We should defer to trial strategy or tactical choices if they are informed ones based upon adequate preparation. Hellard v. State, 629 S.W.2d 4, 9 (Tenn.1982). Additionally, this court should avoid the "distorting effects of hindsight" and "judge the reasonableness of counsel's challenged conduct on the facts of the particular case, viewed as of the time of counsel's conduct." Strickland v. Washington, 466 U.S. at 689-690, 104 S.Ct. at 2065-2066. Moreover, we note that defendants are not entitled to perfect representation, only constitutionally adequate representation. Harries v. State, No. 833 (Tenn. Crim. App. at Knoxville, August 29, 1990), perm. to appeal denied, (Tenn.1991). However, we recognize that "our duty to search for constitutional [deficiencies] with painstaking care is never more exacting than it is in a capital case." Burger v. Kemp, 483 U.S. 776, 785, 107 S.Ct. 3114, 3121 (1987).

To establish the prejudice prong of Strickland, the appellant must show that there is a reasonable probability that, but for counsel's deficient performance, the result of the proceeding would have been different. Strickland v. Washington, 466 U.S. at 694, 104 S.Ct. at 2068. A reasonable probability is one sufficient to

7

undermine confidence in the outcome. Id.  Moreover, when challenging a death sentence, the appellant must show that "there is a reasonable probability that, absent the errors, the sentencer . . . would have concluded that the balance of the aggravating and mitigating circumstances did not warrant death." Henley v. State, 960 S.W.2d 572, 579-580 (Tenn. 1997), reh'g denied, (1998), cert. denied, -- U.S. --, 119 S.Ct. 82 (1998) (citing Strickland v. Washington, 466 U.S. at 695, 104 S.Ct. at 2069).

## B.  Testimony at the Post-Conviction Hearing

At trial, the appellant was represented by James Marty and Brett Stein.[3] Marty testified that he was admitted to the practice of law in 1971 and, at the time of the instant case, his practice was ninety-percent criminal.  Prior to the appellant's case, he had served as lead counsel in three or four capital trials.  From the beginning of the case, Marty was aware that the State was seeking the death penalty.  It was evident that Marty had great difficulty recalling his work on the case.  He was appointed in May of 1985 and the trial commenced in January of 1986.

Marty stated that they had interviewed numerous witnesses; however, he did not remember their names nor the subject matter of their conversation.  He related that his records probably did not indicate all of the witnesses he interviewed.  However, he recalled that the appellant did not want him to interview her children nor were they to be involved with the trial.  He stated that he did not always write everything down on appointed cases, just what he remembered at the time.  He testified that the time sheets were always "way short of the time" he actually spent working on the cases.  Counsel did not request any school, employment, or military records of the victim because he believed they were irrelevant to the case.

---

[3]Originally, Wayne Emmons and James Marty were appointed to the appellant's case; however, Emmons withdrew in December of 1985 and was replaced by Brett Stein.

Marty testified that the appellant was evaluated in 1978, by Dr. Max West, a psychiatrist, as a result of a pending embezzlement charge. Dr. West was called at the sentencing phase for the purpose of offering mitigation proof. Marty testified that the defense team requested funds from the trial court which would have permitted private mental health evaluations; however, this request was denied. The court did grant authorization for the appellant to be evaluated by Midtown Mental Health Center, a state funded facility. Members of the Midtown staff attempted to conduct a competency/sanity evaluation of the appellant on three separate occasions. However, any evaluation was hindered because, on each occasion, the appellant refused to speak with them, except for providing family history information, until she had conferred with counsel. Marty further testified that counsel never advised the appellant not to talk to any mental health expert; explaining "I'm sure I told her to cooperate with them because we needed the mental evaluation, and we didn't get it."

Marty further testified that at trial the defense theory was that the appellant had withdrawn her solicitations to kill her husband and that knowing this, Porterfield murdered the victim in a burglary attempt on their house. Believing the appellant's testimony was critical to their defense, counsel stated that he tried upon several occasions to get the appellant to testify at her trial. The appellant repeatedly refused. He explained that her testimony was crucial to support her defense and also to establish her mental state. In an attempt to bring into question her mental state, he advanced the argument that no sane white lady would venture into an

unfamiliar, all black neighborhood and openly solicit men on the street to kill her husband.

Brett Stein, defense co-counsel, testified that he has practiced law since 1963, engaging primarily in criminal practice. He was appointed to the appellant's

9

case in December of 1985, some thirty days prior to trial, replacing Emmons. Stein stated that Marty remained lead counsel deciding the strategy decisions. He testified that he was aware of the death penalty aggravating circumstances that would be used against the appellant long before the trial even though the State filed their notice the day preceding the trial. Stein related that his file of this case was burned in an office fire. He stated that this case was his first bifurcated capital trial. Stein was also unable to remember much of his participation in the case occurring over ten years ago. He testified that he did not independently obtain the appellant's medical, educational or employment history.

Wayne Emmons, an appointed attorney for the appellant's trial, testified that his first involvement in the case was in May of 1985 and he withdrew from the case in December of 1985, because of commitments in other cases. Emmons testified that he filed the motion for the services of mental health experts. Since the motion was not filed ex parte, he did not specify the reasons for the request or any other specifics for the evaluation, i.e., costs, venue, or doctor.

At the post-conviction hearing, Eric Gentry was called by the appellant to testify as an expert in the field of traumatology.[4] Gentry's testimony and

---

[4]The trial court provided a concise summary of this witness' qualifications in its written finding of facts:

Although [Gentry] was unlicensed in any discipline, he held a Masters in Counseling, and at one time had been licensed in West Virginia in Social Work. He had many "certifications," many of which were irrelevant to the psychological assessment of the petitioner, such as Art Therapy, Biofeedback, Eye Movement Desensitization, etc., and many of which were the result of weekend training seminars. He was tendered to the Court as an expert in Traumatology, which he explained as a study of

traumatic experiences, the effects of traumatic experiences, and what effects they have on a person who's experienced them both from a point of view of a clinical point of view and from a disaster point of view. I specialize with -- with the clinical aspect of that, working with survivors of trauma.

He had not published, but had an article accepted for publication on "compassion fatigue," a study of emergency workers and their problems. He also had another work accepted as a chapter in a book on how to work with trauma survivors, which had not yet been published. His practical experience consisted of working one year in an adolescent shelter, 1 ½ years as a counselor for a community agency, one year as a sex abuse counselor, one year working with homeless children, one year as an addiction counselor at a "wilderness school," and four

"psychosocial" assessment (a social history combined with Gentry's impressions thereof) was essentially offered to show what additional mitigation evidence was available for defense counsel during the penalty phase of the trial. Gentry related that the appellant grew up in a poor, filthy household. He stated that the appellant apparently spent considerable time during her developmental years with her aunt and uncle, which she apparently enjoyed more than living at home with her parents. He testified that the appellant's father was prone to drinking spells and would sometimes beat his wife and children. The appellant also informed Gentry that her mother would beat her as well.

The appellant told Gentry that she was sodomized by her husband on several occasions and was forced to have sex the night before the birth of her second child, which apparently caused severe bleeding. The appellant also told Gentry that her husband was upset when she became pregnant with their first child, because she had forgotten to take her birth control pills and he did not think they could afford the expense of a child. The appellant was charged with embezzlement shortly after the birth of their first child and again after the birth of her second child. Gentry explained that the appellant probably felt the need to alleviate the financial strain on the marriage. It was Gentry's opinion that the appellant has "very poor problem-solving and conflict resolution skills" and "often will acquiesce to the needs and demands of others in order to avoid social conflict." Also, according to Gentry,

---

years working for a psychiatrist as a therapist, gradually concentrating on survivors of trauma. He had no training or experience in forensic psychology. At the time of his testimony, he was a student at Florida State University studying marriage and family therapy and psychotraumatology. He claimed no expertise in anything other than his special area, and testified that "I consider myself an expert in working with survivors of trauma. That's the only thing -- claiming any expertise in here as I sit in this chair right now." He stated he had never before testified as an expert, and would never testify as one again, after this hearing, because it was too hard. . . .

When the witness was tendered as an expert in the field of Traumatology, this Court had serious reservations about his expertise, and asked the witness what he had been doing immediately before beginning his present studies at Florida State. Mr. Gentry answered that he had spent those last seven months prior to his current studies hiking the Appalachian Trail.

given the appellant's upbringing she probably thought any abuse suffered at the hands of her husband was "expected." Gentry further testified:

> As I've previously talked about from my point of view is that there was nothing more important to Gaile than the approval and love of Ron. And that turning him in, giving up that relationship, divorcing him, would have been for her to give up her whole identity, her reason for living, the thing inside of her that meant the most to her.

In assessing the value of the proffered mitigation evidence of Gentry, the post-conviction court entered the following findings:

> In addition to Mr. Gentry's lack of training and experience, this Court finds many of his sources of information appear highly suspect or biased. His primary source for petitioner's social history was petitioner herself, who admittedly has a serious problem with truthfulness. Much of the history she reported was contradicted by her family members, and all of the "sexual trauma" she reported was totally unsupported by any other witnesses or medical records. . . . All of the "trauma" experienced by petitioner, on which Mr. Gentry based his opinions, such as sexual brutality performed on the victim by her husband, was totally unverified. As an example, petitioner claimed that her husband once raped her with a wine bottle, breaking the neck of the bottle off in her vagina. According to petitioner, she did not seek medical treatment, however. There is no proof in the record that she ever related any of this alleged sex abuse or violence to anyone during her entire marriage, or for the first five months of her attorneys' representation. She apparently first related this information to her attorneys the week of the hearing on her pretrial motions. When asked if her children were ever exposed to any of this, Mr. Gentry responded that petitioner told him "that Gaile and Ron were very careful to not let the kids see any of the fights between them that they had" so they would send the kids out to play first. Her family members and friends denied that anything seemed wrong.
>
> . . .
>
> Not only was most of the history petitioner related to Mr. Gentry unverified by independent sources, but much of it was contradicted by her family and other prior statements of petitioner herself. As examples of this, petitioner related to Mr. Gentry that her uncle sexually abused her, and that she had talked to her mother about it. Her mother denied it. Petitioner apparently never told anyone about this molestation until preparing for the hearing on this petition. She said she wanted to have children and the victim did not, and was angry with her for getting pregnant, so she committed the embezzlements to eliminate the financial strain of her pregnancies. This flies in the face of all the evidence that pointed to his loving his two sons, and her reporting to Dr. West that she stole because she wanted extra things for herself and her family. She also stated to Mr. Gentry that in December 1985, she caught her husband and Gala Scott coming back together to his office early one morning, and when he got angry at her for spying he slammed her into his car and called her a "bitch." She stated she decided at that time, while driving out of the parking lot, to commit suicide, and headed to the Mississippi bridge, but instead, apparently on impulse, asked a group of men she saw if they would kill

12

her husband. She claims to have done this for only three days, and then stopped and began trying to recover the photographs and diagrams she had given the men. This unsupported allegation flies in the face of trial testimony that she repeatedly solicited her husband's death over a period of weeks and months. She also explained to Mr. Gentry that she was physically abused, but explained that she had told the police and Dr. West that she had never been physically abused because she didn't think things like being beaten with a belt was physical abuse. However, in her confession to the police she stated she had her husband killed because "We've just had a bad marriage over the years, and I just felt like he had ... mentally I just felt like he had been cruel to me. There was very little physical violence."

. . .

In summary, the best person to have testified to all this abuse during trial would have been petitioner, if this story of continued sexual abuse and physical abuse were true. If her trial attorneys had called Mr. Gentry as a witness, or someone else in 1986 with the same lack of qualifications, his testimony would have been given little or no weight by the jury. . . . The state could have called petitioner's family members in rebuttal to deny the social history related by petitioner. Finally, testimony of petitioner's suffering from "dependent personality disorder" would have *negated* a mitigating reason for her to have caused her husband's death.

Dr. West, a psychiatrist called at the sentencing phase of the trial by the defense and also called at the post-conviction hearing, testified that he examined the appellant for an hour in 1978 because of the appellant's pending embezzlement charge. From his evaluation, he determined that the appellant exhibited no symptoms of a psychotic process, nor was there any history of psychotic disorders in her family. He concluded that, due to her developmental experiences at home, the appellant suffered from a personality disorder and some depression. During the interview, the appellant told Dr. West that she needed help, she had a difficult time being truthful with her husband and other people, and she had stolen at other times when she was younger. She admitted to problems with sex early in her marriage which decreased following the birth of her first child. Following his evaluation, Dr. West informed appellant's counsel, Marty, that "it's extremely difficult if not impossible to make a prediction in regards to possible future changes in psychopathology which [appellant] has demonstrated."

In reviewing the impressions of Eric Gentry at the post-conviction hearing, Dr.

13

West testified that those impressions were consistent with and were a logical extension of his observation of the appellant from the one hour interview nineteen years previous. Dr. West opined that "[t]here would be many factors that would suggest she was ideally situated to be sexually abused" as a teenager, but that in the brief time he saw her, the appellant stated that "everything was fine with her husband." The appellant related to Dr. West that the sexual adjustment in her marriage was satisfactory and that she had no problems with her pregnancies. He testified that his first contact with the appellant's capital trial attorneys was through a letter dated December 26, 1985.

The State called Carolyn Hensley, the appellant's sister. At trial, Mrs. Hensley also testified for the State. She has retained custody of the appellant's children since the appellant's arrest. Hensley related that the appellant had told her trial attorneys not to contact any of her family for trial purposes. Furthermore, she stated that despite her sister's insistence about leaving the family out of the trial, she would not have testified on behalf of her sister for mitigation. She stated, "I think I would have hurt her if they'd have asked me much more. . . in my mind I felt like that it was a matter of taking a life. And pretty much felt that whatever the jury decided and the judge that that was how it was going to be." According to Hensley, her parents were very distraught over the murder and would not have testified either. In fact, Hensley stated that no one in her family wanted to testify for the appellant; "no one wanted to change the sentence if that's what you're asking me."

Hensley further testified that she was interviewed by Gentry before the post-conviction proceeding. Moreover, she had reviewed his report. She testified that she did not agree with some of the facts delineated in Gentry's report. For example, she testified that the appellant never had meningitis and was never sexually abused by her uncle. However, she admitted that her father was abusive toward his children.

14

Ms. Hensley related that she frequently had social contact with the appellant and the victim. She never witnessed the victim abuse the appellant nor did she notice anything unusual about his behavior. Hensley testified that she talked with her sister daily, however, she never mentioned any physical or sexual abuse. She stated that the appellant "spent money like crazy." The appellant's parents reimbursed some of the money the appellant embezzled from her employers. Hensley testified that the appellant lied chronically and "[i]t wouldn't have to be anything even really serious."

### C. Analysis of Ineffective Claims

### 1. Various Claims of Inadequate Investigation

First, the appellant contends counsel were ineffective in preparing and investigating this case. To support this contention, she relies upon trial counsel's time sheets which were submitted for compensation; in essence, she argues that counsel did not log enough hours in this death penalty case. At the post-conviction hearing, each of appellant's counsel exhibited extreme difficulty remembering their involvement in this case that occurred nearly ten years before this hearing. Since the original trial, one of the attorneys lost his case file in an office fire. Additionally, Marty testified that the time recorded on his time sheets was "way short" of the actual time he spent working on the case. As the State argues, the entire record of the trial proceedings must be examined to determine whether the appellant received effective assistance of counsel. See e.g., Hopkinson v. Shillinger, 866 F.2d 1185, 1217 (10th Cir. 1989), cert. denied, 497 U.S. 1010, 110 S.Ct. 3256 (1990), overruled on other grounds by Sawyer v. Smith, 497 U.S. 226, 110 S.Ct. 2822 (1990) (defendant must show specific errors, not solely based upon amount of time afforded to attorney to prepare defense) (citing United States v. Cronic, 466 U.S. 648, 654, 104 S.Ct. 2039, 2043 (1984) and United States v. Pearson, 798 F.2d 385, 388 (10th Cir. 1986)). Therefore, the appellant's insistence that the length of time counsel spent on the case is not dispositive of the issue.

The appellant argues that counsel failed to investigate "the background and personal medical and mental history of the appellant." Specifically, she argues that counsel failed to obtain (1) school records; (2) birth records of her children; (3) the file of Dr. Max West; and (4) Midtown Mental Health Records. She contends that, if these records had been obtained and properly utilized at trial, they would have provided the jury with the "psychodynamics of Ms. Owen's background and why certain building blocks of her personality never developed." In sum, she argues that these records would demonstrate a "dependent personality disorder" and an abusive childhood followed by an abusive marriage.

In reference to these allegations, the post-conviction court found:

No other witnesses support any of her alleged medical problems, or their causes, which are also unsupported by any documentation. Petitioner has failed to show her attorneys ineffective in failing to investigate her medical history, as there is nothing her attorneys could have discovered other than the unsupported statements of petitioner, who has been described as a chronic liar by her psychiatrist, her "traumatologist," and her sister.

Moreover, the post-conviction court concluded,

that even assuming the performance of her trial attorneys was deficient, that deficiency caused no prejudice to petitioner. First, the nature and extent of the mitigating evidence that has been suggested should have been offered has little credibility or relevance. Second, although similar mitigating evidence was not presented, if it had been presented it would have opened the door to damaging evidence to the contrary.

Again, the post-conviction court's findings are presumed correct unless the evidence preponderates otherwise. We agree with these findings. This issue is without merit.

Next, the appellant claims the victim's records and investigation into his background were essential to support her case that she was abused by the victim physically, sexually, and mentally. She asserts that these records, especially his military records and employment records, demonstrate that the victim perpetuated a facade of a happy and normal home life while concealing the lies and the abusive

16

side of his marriage. This, she contends, would have allowed her claims of abuse to be better received. The State cites State v. Johnson, 698 S.W.2d 631, 634 (Tenn. 1985), in which the court held that victim's character traits are irrelevant for mitigation in a capital sentencing hearing. As the post-conviction court observed, the claims of abuse were just that, claims, without any other corroborating evidence to support them. See also State v. Teague, 680 S.W.2d 785, 788 (1984) (victim's traits are irrelevant to mitigation evidence). Finding no evidence to preponderate against the trial court's findings, this issue is without merit.

## 2. *Ex Parte* Motion for Expert Services

The appellant also argues that counsel were ineffective by failing to file an *ex parte* motion for state paid expert assistance prior to trial. Before trial, counsel filed a motion, not *ex parte*, requesting funds for an independent mental evaluation. Although the trial court denied the request for an independent examination, the appellant was ordered to be examined for competency and sanity by the Midtown Mental Health Center. The appellant asserts that counsel should have sought funds

in an *ex parte* hearing enabling counsel to provide better argument in support of the motion.

The appellant has not demonstrated how she was harmed by counsel's failure to request the services of an independent expert by an *ex parte* motion. See Black v. State, 794 S.W.2d 752, 757 (Tenn. Crim. App. 1990). "The defendant must show that a substantial need exists requiring the assistance of state paid supporting services and that this defense cannot be fully developed without such professional assistance." State v. Evans, 838 S.W.2d 185, 192 (Tenn. 1992), cert. denied, 510 U.S. 1064, 114 S.Ct. 740 (1994). Notwithstanding the testimony of the traumatologist, we conclude that the proof did not establish that a "substantial need" existed for state paid expert assistance. Finding no prejudice, this issue is without

merit.

### 3. Failure to Request Investigative Services

The appellant contends counsel was deficient by failing to request investigative services or to file a continuance motion due to a lack of investigation. For purposes of proving an ineffective assistance of counsel claim, proof of deficient representation by omission requires more than a speculative showing of a lost potential benefit. The appellant failed to produce any evidence at the post-conviction hearing indicating that an investigator would have discovered any information favorable to her case. Accordingly, this allegation of deficient performance fails both prongs of Strickland and is without merit.

### 4. Testimony of Dr. West

The appellant alleges that counsel were ineffective in failing to properly interview Dr. West pre-trial and failing to manage his testimony at trial. The appellant contends that her attorneys should have questioned the trial court's hearsay ruling that prevented Dr. West from testifying to the information that the appellant related about her social history. In a capital sentencing hearing, any relevant mitigating evidence is allowed regardless of the rules of evidence. See Tenn. Code Ann. § 39-2-203(c) (repealed 1991, replaced by 39-13-204 (1991)). The post-conviction court found that the limited questioning of Dr. West was a tactical, strategical decision by her attorneys, that would not be second guessed. See Hellard, 629 S.W.2d at 9. Additionally, the court found that the appellant failed to establish prejudice because if Dr. West testified to her social history, he would have revealed, "damaging admissions by petitioner that she had no problems with her marriage, and that she had a long term problem with lying and stealing, would not have helped her gain sympathy with the jury." The record does not preponderate against these findings.

### 5. Failure to Request a Continuance

The appellant complains that counsel were ineffective because they failed to file a motion for a continuance prior to trial, which would have been "automatic," due to the State's failure to comply with the notice requirements of the aggravating circumstances sought in this capital case. At the post-conviction proceeding, counsel testified that they were aware from the beginning of the case that the State was seeking the death penalty. Counsel felt it was obvious which aggravating factors the prosecution would use at the sentencing phase and therefore did not move for a continuance. In this regard, the supreme court in the direct appeal noted, "there is nothing in the record to indicate either that the defendants were surprised when the state announced the aggravating circumstances it intended to prove, or that the defendants were prejudiced in any way by the timing of the notice." See Porterfield, 746 S.W.2d at 450. The appellant also failed at the post-conviction hearing to demonstrate any surprise on the part of the appellant, to

demonstrate how this motion would have impacted her trial, or that prejudice resulted. This issue is without merit.

### II. Recusal of Post-Conviction Judge

Second, the appellant contends that the post-conviction judge abused his discretion in failing to recuse himself from these proceedings because (1) the impartiality of the trial judge might reasonably be questioned because of his employment in the district attorney's office that tried the case and (2) the trial judge "demonstrated actual bias [in numerous areas] in favor of the prosecution" during the hearing and in the written order denying relief. She supports her argument by citing Supreme Court Rule 10, Code of Judicial Conduct, Canon 3(E) in that, "[a] judge shall disqualify himself. . . [where] a lawyer with whom the judge previously practiced law served during such association as a lawyer concerning the matter" and that the court's "impartiality might reasonably be questioned."

In this case, the post-conviction judge was employed as a Shelby County Assistant District Attorney during the period that the Shelby County District Attorney's Office prosecuted the appellant. The proof established that the judge was <u>one of nearly seventy attorneys</u> employed by the District Attorney's Office. He was never assigned to prosecute or assist in the prosecution of this case. He related that he knew nothing about the facts of this case, other than reading advance sheets regarding the supreme court's opinion in the direct appeal and their interlocutory appeal opinion regarding expert services for post-conviction defendants, nor did he know the attorneys involved.

A motion to recuse is addressed to the sound discretion of the trial court and will not be reversed unless the face of the record reveals "clear abuse." <u>State v. Hines</u>, 919 S.W.2d 573, 578 (Tenn. 1995), <u>cert. denied</u>, 519 U.S. 847, 117 S.Ct. 133 (1996) (citation omitted).

Tenn. Sup. Ct. Rule 10, Canon 3(E) provides,

> A judge shall disqualify himself. . . in a proceeding in which the judge's impartiality might reasonably be questioned, including but not limited to instances where:
> (a) the judge has a personal bias or prejudice concerning a party or a party's lawyer, or personal knowledge of disputed evidentiary facts concerning the proceeding;
> (b) the judge served as a lawyer in the matter in controversy, or a lawyer with whom the judge previously practiced law served during such association as a lawyer concerning the matter, or the judge has been a material witness concerning it.

We note that the commentary to this section includes,

> [a] lawyer in a government agency does not ordinarily have an association with other lawyers employed by that agency within the meaning of Section E(1)(b); a judge formerly employed by a government agency, however, should disqualify himself . . . in a proceeding if the judge's impartiality might reasonably be questioned because of such association.

Nothing in the record before us suggests that the judge's impartiality should be questioned. Therefore, we conclude that the trial judge did not abuse his discretion in denying the recusal motion.

Second, the appellant complains that the post-conviction judge's conduct at the post-conviction hearing demonstrated bias in favor of the prosecution as exemplified by his written order denying relief. She claims bias of the post-conviction judge in the following areas: (1) dismissing the appellant's claims and proof of sexual abuse; (2) assessing potential expert proof; (3) evaluating the testimony of Dr. West; (4) dismissing a "legitimate psychological discipline" i.e., traumatology, thereby besmirching the expert testimony offered by the appellant.

Initially, we note, as the appellant acknowledges, that adverse rulings by a court are not usually sufficient grounds to establish bias. Alley v. State, 882 S.W.2d 810, 820 (Tenn. Crim. App. 1994). Moreover, "[t]he issue to be determined is not the propriety of the judicial conduct of the judge, but whether he committed an error which resulted in an unjust disposition. . . ." State v. Hurley, 876 S.W.2d 57, 64 (Tenn. 1993). The appellant asserts that the trial court's conduct in this case went far beyond an adverse ruling.

From our review of the record, the post-conviction court conducted an extremely fair hearing exercising great leniency for each side in managing their witnesses, offering assistance in clarification of questions and responses, and did not exclude any testimony or evidence. Moreover, the court rarely sustained an objection for the prosecution. Within the trial court's written order lies the appellant's greatest complaint. See supra. The appellant asserts in her brief that the court failed to consider the traumatologist's testimony or psychosocial report, which we acknowledge was within the trial court's bounds not to accredit as the trier of fact. Following the trial court's review of the trial record and the evidence introduced at the post-conviction proceeding, the court filed a comprehensive written order, addressing specifically each of the appellant's allegations. The record is void of any suggestion that the court demonstrated direct antagonism against the appellant or expressed any opinion about the merits of the proceeding prior to the hearing. See

21

Alley, 882 S.W.2d at 821-822.

We conclude that neither the judge's remarks and actions at the post-conviction hearing nor his written order were inappropriate and did not diminish the overall fairness of the proceeding, even applying the heightened standards of due process applicable in a capital case.  See State v. Cazes, 875 S.W.2d 253, 260 (Tenn. 1994), cert. denied, 513 U.S. 1086, 115 S.Ct. 743 (1995).  Accordingly, this issue is without merit.

### III.  Alleged Brady Violations

The appellant asserts that the State withheld exculpatory evidence thereby violating Brady v. Maryland, 373 U.S. 83, 83 S.Ct. 1194 (1963).  Specifically, the appellant argues that the State failed to relinquish "love letters" regarding extramarital affairs of the victim found in the victim's office after his death which were material and relevant to the appellant's state of mind and the victim's treatment of the appellant.  Thus, she contends the letters should have been revealed prior to trial to demonstrate proof of a "continuing extramarital affair."

In Brady, 373 U.S. at 83, 83 S.Ct. at 1194, the Supreme Court held that the prosecution has a duty to furnish the defendant with exculpatory evidence relating either to the defendant's guilt or innocence or to the potential punishment that may be imposed.  See also Roger Morris Bell v. State, No. 03C01-9210-CR-00364 (Tenn. Crim. App. at Knoxville, Mar. 15,1995), perm. to appeal denied, (Tenn. Aug. 28, 1995).

The proof establishes that the appellant discovered the victim's affair with Gala Scott several months prior to the murder.  This discovery led the appellant to consider suicide and subsequently solicit her husband's murder.  Moreover, the

22

appellant's attorneys were aware of extramarital affairs of the victim through their conversations with the appellant as evidenced by their request for information in their exculpatory motion. The duty upon the State under Brady does not extend to information already in the possession of the defense or that they are able to obtain or to information not in possession or control of the prosecution. Banks v. State, 556 S.W.2d 88, 90 (Tenn. Crim. App. 1977).

More importantly, however, is the requirement that the information suppressed must have been exculpatory, i.e., favorable to the appellant. We conclude that this evidence was not favorable and, accordingly, no Brady violation is found. In this regard, we would not disagree with trial counsel's testimony that introduction of this evidence may have provided the appellant with a motive to kill her husband. This issue is without merit.

**IV. Vicarious Application of the Heinous, Atrocious, and Cruel Aggravator**

Next, the appellant argues that the vicarious application of the (i)(5) aggravating circumstance, i.e., "[t]he murder was especially heinous, atrocious, or cruel in that it involved torture or depravity of mind," see Tenn. Code Ann. § 39-2-203(i)(5) (1982) (repealed 1989),[5] was improper. Her argument is premised upon United States Supreme Court decisions which hold that in order for a death penalty to pass Eighth Amendment constitutional muster, the sentence must represent an individualized sentence rather than one which "can be called capricious or arbitrary."[6] Thus, she argues that constitutional restraints on the imposition of capital punishment prevent the imposition of the death penalty based upon the

---

[5]This provision has been replaced by Tenn. Code Ann. § 39-13-204(i)(5) (1997 & 1998 Supp.), which provides, "[t]hat the murder was especially heinous, atrocious, or cruel in that it involved torture or serious physical abuse beyond that necessary to produce death."

[6]In Gregg v. Georgia, 428 U.S. 153, 96 S.Ct. 2909 (1976), the Supreme Court interpreted the Eighth Amendment to require sentencers to individualize defendants through consideration of mitigation evidence. In capital sentencing decisions, the States were required to allow the sentencers to make a determination based upon "the circumstances of each individual homicide and individual defendant." Proffit v. Florida, 428 U.S. 242, 258, 96 S.Ct. 2960, 2969 (1976).

conduct of an accomplice. Moreover, she contends there is no proof in the record to indicate that she directed Porterfield, her co-defendant, to kill the victim by bludgeoning him with a tire iron and, consequently, the acts of Porterfield cannot be attributed to her. To support her contention, the appellant asks this court to adopt the holdings of Omelus v. State, 584 So. 2d 563 (Fla. 1991) and State v. Isa, 850 S.W.2d 876 (Mo. 1993), both of which held that a convicted murderer who did not actually kill the victim cannot be held responsible for the nature of the killing. In Omelus, 584 So. 2d at 563, the defendant was convicted of contracting the murder of another. The proof did not establish that the defendant was actively involved in the planning of the murder or knew how the third person would commit the killing. Id. The Florida Supreme Court held that the aggravating circumstance that the murder was especially heinous, atrocious, or cruel could not be applied to the defendant. Id.

The State argues, first, that this issue was raised by the appellant on direct appeal, in that, in essence, it is a claim supporting the sufficiency of the aggravating factor. Moreover, the State claims that the expansion of the argument regarding this aggravating factor to its vicarious application is waived for failure to make an objection at trial or raise the specific issue on direct appeal. Third, the State contends that the aggravator is supported based upon the appellant's "depravity of mind." In the alternative, the State argues that, if the aggravator was erroneously applied, it constitutes harmless error under State v. Howell, 868 S.W.2d 238 (Tenn. 1993), in light of the substantial proof of the other aggravator and the minimal mitigation.

We reject the State's argument that this issue was previously determined by the Tennessee Supreme Court. But see State v. Blanton, 975 S.W.2d 269, 280 (Tenn.), reh'g denied, (1998), cert. denied, -- U.S. -- , 119 S.Ct. 1118 (1999) (appellant argued no evidence to determine whether he shot and stabbed victim;

24

court addressed issue under sufficiency of evidence review holding evidence of aggravator was clearly sufficient in direct appeal). In the direct appeal, only the defendant Porterfield challenged the application of the (i)(5) aggravator. Because this issue was not raised in the appellant's direct appeal, it is waived. See Tenn. Code Ann. § 40-30-112(1) and (2) (1990).

Nevertheless, we address the issue of vicarious application of the (i)(5) aggravating factor on the merits. Although, under the premise of vicarious application, concerns arise regarding the constitutional standards governing individualized sentencing, we conclude that the vicarious application of an aggravating circumstance, where statutorily permissible, does not trespass upon the mandates of either the Eighth Amendment of the United States Constitution or Article 1, Section 16 of the Tennessee Constitution.

The United States Supreme Court addressed a similar issue in Enmund v. Florida, 458 U.S. 781, 798, 102 S.Ct. 3368, 3377 (1982),[7] where the Court's holding prohibited the institution of the death penalty on a non-participating accomplice, in other words, a non-triggerman could not receive the death penalty. Specifically, the Court held, "the imposition of the death penalty on one such as Enmund who. . . does not himself kill, attempt to kill, or intend that a killing take place or that lethal force will be employed" is constitutionally prohibited. Enmund v. Florida, 458 U.S. at 797, 102 S.Ct. at 3376. The opinion further held, "[t]he focus must be on [the defendant's personal] culpability, not on that of those who committed the robbery and shot the victims, for we insist on 'individualized consideration as a constitutional requirement in imposing the death sentence." Id. (citing Lockett v. Ohio, 438 U.S. 586, 605, 98 S.Ct. 2954, 2965 (1978)).

---

[7]The defendant in Enmund v. Florida remained in the getaway car while one of his two codefendants robbed and killed an elderly couple. The defendant was convicted of felony murder and sentenced to death. See Enmund, 458 U.S. at 784-785, 102 S.Ct. at 3370.

Five years later, the Court in <u>Tison v. Arizona</u>, 481 U.S. 137, 107 S.Ct. 1676 (1987), another felony murder case based upon accomplice liability, explained <u>Enmund</u> to mean that Enmund's conduct was too tangential and attenuated without proof of intent. The Court dramatically refined the <u>Enmund</u> intent rule and held that "major participation in the felony committed, combined with reckless indifference to human life" demonstrated culpability sufficient for execution. <u>Tison v. Arizona</u>, 481 U.S. at 158, 107 S.Ct. at 1688.[8] Thus, after <u>Tison</u>, nearly all defendants convicted of felony murder, both killers and non-triggermen, became death eligible. Indeed,

> a death penalty sentence may be imposed where a defendant kills, attempts to kill, intends that a killing take place, or that lethal force will be imposed, or where a defendant's personal involvement in the underlying felony is substantial and who exhibits a reckless disregard or indifference to the value of human life.

See <u>State v. Bigbee</u>, 885 S.W.2d 797, 817 (Tenn. 1994) (Reid, J., concurring) (citing <u>Tison v. Arizona</u>, 481 U.S. at 137, 107 S.Ct. at 1676; <u>Enmund v. Florida</u>, 458 U.S. at 797, 192 S.Ct. at 3377; <u>State v. Brannam</u>, 855 S.W.2d 563, 570-571 (Tenn. 1993); <u>State v. Middlebrooks</u>, 840 S.W.2d 317, 338 (Tenn. 1992)).

Notwithstanding its expansion of the <u>Enmund</u> holding, <u>Tison</u> did not relax the constitutional mandate against the arbitrary administration of the death penalty and, particularly, did not address the vicarious application of aggravating circumstances. But see <u>State v. Tison</u>, 633 P.2d 335, 354 (Ariz. 1981), <u>cert. denied</u>, 459 U.S. 882, 103 S.Ct. 180 (1982) (death penalty affirmed to nontriggerman where 'heinous atrocious cruel' and pecuniary gain aggravating circumstances applied vicariously).[9]

---

[8]Ricky and Raymond Tison, the two defendants in <u>Tison v. Arizona</u>, accompanied by their brother Donald broke their father, Gary, and his cellmate out of the Arizona State Prison. The fugitives flagged down a passing car occupied by the Lyons family. This family was overtaken, driven into the desert, ordered out of their car, and forced to stand in front of the headlights. Gary Tison instructed his sons to retrieve some water for the Lyons from the trunk of the vehicle. Thereafter, Gary and his prisonmate brutally executed the entire Lyons family. See <u>Tison v. Arizona</u>, 481 U.S. at 139-141, 107 S.Ct. at 1678-1679. Notwithstanding the fact that neither brother was the triggerman, the Supreme Court affirmed both sentences of death. <u>Id.</u>

[9]We note that the Supreme Court did grant review of the Arizona Supreme Court's denial of post-conviction relief in the case of Ricky Wayne and Raymond Curtis Tison. See <u>Tison</u>, 481 U.S. at 137, 107 S.Ct. at 1676. A post-conviction petition was filed by the Tison brothers in Arizona alleging that <u>Enmund v. Florida</u>, which had been decided in the interim, required reversal of the death penalty. A divided Arizona Supreme Court interpreted Enmund to require a finding of intent to kill, <u>see State v. Tison</u>, 690 P.2d 747 (Ariz. 1984). In granting certiorari, the Supreme Court limited its review solely to the Arizona court's interpretation of <u>Enmund</u>.

26

Even though the United States Supreme Court has demonstrated apparent reluctance to review the issue of vicarious application,[10] it has repeatedly emphasized that, to justify imposition of the death penalty, capital sentencing decisions must be "an *individualized* determination on the basis of the character of the individual **and** the circumstances of the crime." Zant v. Stephens, 462 U.S. 862, 879-880, 103 S.Ct. 2733, 2743-2744 (1983) (first emphasis in original) (second emphasis added). See also Eddings v. Oklahoma, 455 U.S. 104, 110-112, 102 S.Ct. 869, 874 (1982); Enmund v. Florida, 458 U.S. at 798, 102 S.Ct. at 3377; Lockett v. Ohio, 438 U.S. at 601-605, 98 S.Ct. at 2963-2965 (plurality opinion); Woodson v. North Carolina, 428 U.S. 280, 303-304, 96 S.Ct. 2978, 2990-2991 (1976) (plurality opinion); Proffitt v. Florida, 428 U.S. 242, 258, 96 S.Ct. 2960, 2969 (1976). The Edmund-Tison holding addresses only whether a non-triggerman may be sentenced to death; it does not address whether the conduct of the triggerman may be used to aggravate the sentence of the non-triggerman. Thus, our inquiry must necessarily begin where Edmund-Tison ends.

Although a defendant may be death eligible following a determination of "major participation combined with reckless indifference to human life" under Enmund-Tison, the question remains whether an aggravating factor may be applied vicariously to a defendant if he was not the actor responsible for the particular aggravating circumstance. In this regard, there is no Tennessee case that has decided the issue of whether a convicted murderer, who took no part in the killing itself and was unaware as to how it was to be accomplished, can be sentenced to death based upon the "heinous, atrocious, and cruel" aggravating circumstance. In the felony murder context, the Tennessee Supreme Court has impliedly upheld the vicarious application of the heinous, atrocious, and cruel aggravator. See Blanton, 975 S.W.2d at 279-280 ('heinous atrocious cruel' factor upheld as applied to

---

[10]The United States Supreme Court has been presented the issue of vicarious application of a statutory aggravating circumstance on other occasions and has denied review. See, e.g., Herrera v. Arizona, 510 U.S. 951, 114 S.Ct. 398 (1993).

27

premeditated murder convictions based on sufficiency of evidence despite no evidence that defendant was perpetrator who inflicted fatal blows); State v. West, 767 S.W.2d 387, 389, 396-397 (Tenn. 1989), cert. denied, 497 U.S. 1010, 110 S.Ct. 3254 (1990) (aggravating circumstances, (i)(5), (i)(6), and (i)(7), applied to defendant in capital case based upon finding of major participation and reckless indifference).[11]  We conclude that a non-triggerman defendant can be held vicariously liable for an aggravating circumstance following an Enmund-Tison determination.

In the case *sub judice*, the appellant is death eligible under Enmund-Tison. See State v. Johnson, 762 S.W.2d 110, 120 (Tenn. 1988), cert. denied, 489 U.S. 1091, 109 S.Ct. 1559 (1989) (finding that Eighth Amendment does not prohibit death penalty in case of defendant whose participation in felony resulting in murder is major and whose mental state is one of reckless indifference).  The appellant willingly and knowingly associated herself with others for the purpose of effecting a premeditated murder upon her husband resulting in his heinous, atrocious, and cruel death.  The proof gleaned from her confession and testimony of eyewitnesses demonstrated that she repeatedly gave several men large sums of money to

---

[11]This court has also addressed similar issues.  See State v. Stacy Dewayne Ramsey, No. 01C01-9412-CC-00408 (Tenn. Crim. App. at Nashville, May 19, 1998), perm. to appeal denied, (Tenn. Jan. 25, 1999) (life without parole upheld distinguished from principle announced in Omelus because of defendant's active participation in planning and nature of killing); Jeffrey Stuart Dicks v. State, No. 03C01-9606-CC-00231 (Tenn. Crim. App. at Knoxville, Mar. 17, 1998), perm. to appeal granted, (Tenn. Sept. 21, 1998), certiorari dismissed as moot, (Tenn. June 21, 1999) (recognizing principle stated in Omelus but distinguished because defendant present at crime scene); William E. Groseclose v. State, No. 02C01-9407-CR-00145 (Tenn. Crim. App. at Jackson, Aug. 23, 1995), perm. to appeal denied, (Tenn. 1996) (distinguished from holding in Omelus because defendant actively involved in planning of murder or knew how contract killer was going to commit murder).

Other federal and state courts have also addressed this issue.  See, e.g., White v. Wainwright, 809 F.2d 1478, 1485 (11th Cir. 1987) (death penalty upheld based upon vicarious application of heinous, atrocious cruel factor since defendant was armed and on scene as active participant in robbery); Ex parte Bankhead, 585 So. 2d 112, 125 (Ala. 1991) ('heinous atrocious cruel' aggravating circumstance upheld based on manner of killing and not on defendant's actual participation); Haney v. State, 603 So. 2d 368, 380-381, 385-387 (Ala. Crim. App. 1991) (appellant admitted paying co-defendant to kill her husband and giving him instructions on how to approach her home without being observed); Fox v. State, 779 P.2d 562, 578 (Okla. Crim. App. 1989), cert. denied, 494 U.S. 1060, 110 S.Ct. 1538 (1990) (death penalty supported by evidence that defendant armed himself with shotgun and shells before robbing grocery store with codefendant where three people were killed). But see Omelus, 584 So. 2d at 563 (defendant who hired contract killer cannot be held vicariously responsible under 'heinous atrocious cruel' factor).

28

effectuate that criminal purpose. She supplied these men with photographs of her husband, his car, and their home, as well as a diagram of his parking space at work. Moreover, she personally drove her codefendant by her home and her church ordering him to make the crime appear to be a burglary/robbery. She gave her codefendant a key to her house, met with him the afternoon of the murder, and went to church with her husband that evening. The appellant refused to allow her children to remain at church with their father to play basketball that evening; she took them to her sister's home and played games in order for the murder to occur. Upon her later arrival at her home, despite obvious signs of the crime, she allowed her children to enter into the house to find their murdered father. This proof evinces the appellant's participation combined with reckless indifference. Accordingly, the appellant is death eligible under Enmund-Tison.

Eligibility for capital punishment via vicarious liability, however, is not absolute; rather, it is subject to statutory limitations. Tennessee has chosen to constitutionally narrow the class of death eligible defendants by statutorily enumerating a number of specific aggravating circumstances and expressly requiring the finding of at least one aggravating circumstance beyond a reasonable doubt before the death penalty can be imposed. See Tenn. Code Ann. § 39-2-203(g) (1982); see also Middlebrooks, 840 S.W.2d at 344.[12] In the present case, the State must prove that "[t]he murder was especially heinous, atrocious, or cruel in that it involved torture or depravity of mind." Tenn. Code Ann. § 39-2-203(i)(5)

_____

[12]This holding does not conflict with the decision of our supreme court in Middlebrooks, 840 S.W.2d at 317, which addressed the use of aggravating circumstances to narrow the death-eligible class to those defendants for whom imposition of the death penalty is most appropriate. In Middlebrooks, the court held that because the felony murder aggravating circumstance, Tenn. Code Ann. § 39-2-203(i)(7), essentially duplicated the elements of the offense of first degree murder, it failed to narrow the population of death-eligible felony murder defendants as required by Article 1, Section 16 of the Tennessee Constitution. Thus, by eliminating felony murder as an aggravating circumstance in first degree felony murder convictions, Middlebrooks has accomplished two results. First, it created a new category of defendants who are immune from the imposition of the death penalty in cases where the defendant is charged with felony murder and the only aggravating circumstance is the underlying felony. See Howell, 868 S.W.2d at 267 (Reid, C.J., concurring), cert. denied, 510 U.S. 1215, 114 S.Ct. 1339 (1994). Second, it eliminates felony murder as an aggravating circumstance in selecting those death eligible defendants who are most deserving of the sentence of death in those cases where other aggravating circumstances are present. Id.

29

(emphasis added), in order to establish the presence of the aggravating circumstance at issue. The plain language of this provision, "read in context of the entire statute, without any forced or subtle construction which would extend or limit its meaning," see generally State v. Cauthern, 967 S.W.2d 726, 735 (Tenn. 1998), cert. denied, -- U.S. --, 119 S.Ct. 414 (1998); State v. Johnson, 970 S.W.2d 500, 505 (Tenn. Crim. App. 1996), perm. to appeal denied, (Tenn. 1997), clearly focuses on the murder itself and not the defendant's own actions or intent. Cf. State v. Hall, 976 S.W.2d 121, 134 (Tenn. 1998), cert. denied, -- U.S. --, 119 S.Ct. 1501 (1999) (plain language of (i)(8) aggravator, during defendant's escape from lawful custody, adhered to in construing legislative intent). After examination of this issue, we conclude that it was the legislature's intent that the (i)(5) aggravator impute liability upon a defendant for conduct for which he or she is criminally responsible. This aggravator, by its plain language, clearly encompasses consideration of the nature and circumstances of the crime itself, which would permit such a vicarious application.[13] Cf. Ex parte Bankhead, 585 So. 2d at 125 ('heinous atrocious cruel' aggravating circumstance upheld based on the manner of killing and not on defendant's actual participation). The emphasis in the (i)(5) aggravator is on the manner of killing, not on the defendant's actual participation. When the defendant contracts for another to commit murder and that murder is committed in a heinous, atrocious, and cruel manner, we conclude that this aggravator may appropriately be applied in imposing a sentence of death. We hold that the factual application of the heinous, atrocious, and cruel aggravating circumstance is supported by the proof in this case. This issue is without merit.

---

[13]Certain aggravators focus clearly on the defendant's own actions or intent and contemplates considerations on the defendant's individual actions in determining the most culpable capital defendants. See Tenn. Code Ann. § 39-2-203(i)(2) (defendant history of violent felonies); -203(i)(3) (defendant created risk of death to others); -203(i)(4) (defendant committed murder for remuneration); -203(i)(12) (defendant committed mass murder). Alternatively, other statutory aggravators, by their plain language, clearly encompass consideration of the nature and circumstances of the crime itself, permitting vicarious application. See Tenn. Code Ann. §§ 39-2-203(i)(1) (murder committed against person under 12); -203(i)(5) (murder was especially heinous, atrocious, or cruel); -203(i)(6) (murder committed for purpose of avoiding arrest or prosecution); -203(i)(7) (murder committed while defendant was engaged in enumerated felony); -203(i)(8) (murder committed while in custody or during escape therefrom); -203(i)(9) (murder committed against law enforcement officer); -203(i)(10) (murder committed against judge/district attorney); -203(i)(11) (murder committed against elected official).

Within this challenge, the appellant citing Wade v. Calderon, 29 F.3d 1312, 1320 (9th Cir. 1994), cert. denied, 513 U.S. 923, 115 S.Ct. 923 (1995), contends that the (i)(5) aggravator is unconstitutionally vague because it failed to instruct that the appellant intended to inflict serious physical abuse. First, we note that the (i)(5) aggravator at issue in this case does not contain any reference to serious physical abuse but is related to torture and depravity of mind. Compare Tenn. Code Ann. § 39-13-204(i)(5) (1997 & Supp. 1998) and Tenn. Code Ann. § 39-2-203(i)(5) (1982) (repealed 1989). Moreover, we are not bound by the decisions of the federal circuit courts but only by decisions of the United States and Tennessee Supreme Courts. See State v. Middlebrooks, No. 01S01-9802-CR-00017 (Tenn. July 6, 1999) (for publication) (citing State v. McKay, 680 S.W.2d 447, 450 (Tenn. 1984)); State v. Strouth, No. 03S01-9707-CC-00079 (Tenn. Jun. 28, 1999) (for publication). Nevertheless, the supreme court of this state has repeatedly upheld the validity of the (i)(5) aggravating circumstance when challenged for vagueness. See e.,g., Strouth, No. 03S01-9707-CC-00079; Blanton, 975 S.W.2d at 280; Hartman v. State, 896 S.W.2d 94, 105 (Tenn. 1995); State v. Black, 815 S.W.2d 166, 181 (Tenn. 1991); State v. Thompson, 768 S.W.2d 239, 252 (Tenn. 1989); State v. Barber, 753 S.W.2d 659, 670 (Tenn. 1988). Additionally, the supreme court has held that intent is irrelevant in the (i)(5) aggravating circumstance because the focus remains on the circumstances of the killing. State v. Carter, 988 S.W.2d 145, 150 (Tenn. 1999) (citing Blanton, 975 S.W.2d at 269). Accordingly, this issue is without merit.

## V. Unconstitutional Duplication of the Remuneration Aggravator

The appellant argues that the evidence used to convict her as an accessory before the fact to first-degree murder duplicated that used to support the (i)(4) aggravating circumstance. See Tenn. Code Ann. §39-2-203(i)(4) (1982) (repealed 1989).[14] She argues that this duplication of facts to support both the conviction and

---

[14]"The defendant committed the murder for remuneration or the promise of remuneration, or employed another to commit the murder for remuneration or the promise of remuneration."

the sentence does not sufficiently narrow the class of death eligible defendants in violation of the 8th and 14th Amendments to the United States Constitution and Article I, §§ 8 and 16 of the Tennessee Constitution. She contends that the (i)(4) aggravating factor falls under Middlebrooks, 840 S.W.2d at 317, as duplicating the offense for which she was found guilty. The appellant's argument is misplaced and fails because this is simply not a Middlebrooks issue as was stated by the supreme court in State v. Stephenson, 878 S.W.2d 530, 557 (Tenn. 1994).

The appellant attempts to distinguish her case from Stephenson on the basis that the defendant's conviction was based upon only the elements of first degree murder and the (i)(4) aggravating circumstance narrowed the class of death eligible defendants in that case because at the sentencing phase the prosecution had to additionally prove that the defendant hired someone to kill her husband. Id. Her case, she argues, found her guilty of hiring a codefendant to kill her husband and then was sentenced on the same basis without the prosecution having to prove anything else. However, the appellant ignores the fact that not only was Stephenson convicted of first degree murder, his conviction was also based upon the criminal responsibility statutes. See Tenn. Code Ann. § 39-11-402(2).[15]

In Stephenson, the supreme court held that the (i)(4) aggravator sufficiently narrowed those death eligible defendants because it provides a "principled way in which to distinguish the cases in which the death penalty is imposed from the many cases in which it is not. . . ." Stephenson, 878 S.W.2d at 557. The court further reasoned:

> The aggravating circumstance - the defendant employed another to commit the murder for remuneration or the promise of remuneration-

---

[15]A person is criminally responsible for an offense committed by the conduct of another if: Acting with intent to promote or assist the commission of the offense, or to benefit in the proceeds or results of the offense, the person solicits, directs, aids, or attempts to aid another person to commit the offense. . . . See Tenn. Code Ann. § 39-11-402(2).

32

> does not duplicate the elements of the offense, even incorporating the
> criminal responsibility statutes. Constitutional narrowing is
> accomplished because at the sentencing hearing, the State was
> required to prove that this defendant hired someone to kill his wife.
> *Obviously, not every defendant who is guilty of first-degree murder
> pursuant to the criminal responsibility statutes has also hired another
> or promised to pay another to commit the murder.* Thus, the
> aggravating circumstance found by the jury in this case narrows the
> class of death-eligible defendants as required by *State v.
> Middlebrooks, supra.*

Id. at 557 (emphasis added). See also Richard H. Austin v. State, No. 02C01-9310-

CR-00238 (Tenn. Crim. App. at Jackson, May 3, 1995), perm. to appeal denied,

(Tenn. Nov. 6, 1995).


The appellant was convicted of accessory before the fact to first-degree

murder. Accessory before the fact was defined as "any person who shall feloniously

move, incite, counsel, hire, command, or procure any other person to commit a

felony, is an accessory before the fact." Tenn. Code Ann. § 39-1-301 (1982)

(repealed 1989).[16] This definition was replaced by the criminal responsibility

provisions of Tenn. Code Ann. § 39-11-402(2). Thus, we conclude that we are

bound by the supreme court's decision in Stephenson that the (i)(4) aggravator

achieves the constitutionally required narrowing of the death eligible defendants

even where the conviction is predicated on a criminal responsibility theory.

Accordingly, this issue is without merit.


## VI. Reasonable Doubt Jury Instructions

Next, the appellant challenges the constitutionality of the reasonable doubt

jury instruction given at both stages of the trial including the language "moral

certainty" which he contends falls below the requirements of the Due Process

Clause. This argument had been rejected on numerous occasions. State v.

Nichols, 877 S.W.2d 722, 734 (Tenn. 1994), cert. denied, 513 U.S. 1114, 115 S.Ct.

909 (1995); Pettyjohn v. State, 885 S.W.2d 364, 365-66 (Tenn. Crim. App.), perm.

---

[16]Existing at the date of this offense, an accessory before the fact was deemed a principal offender and punished as such. See Tenn. Code Ann. § 39-1-302 (1982)(repealed 1989).

to appeal denied, (Tenn. 1994); State v. Hallock, 875 S.W.2d 285, 294 (Tenn. Crim. App. 1993), perm. to appeal denied, (Tenn. 1994). See also Austin v. Bell, 126 F.3d 843, 846-47 (6th Cir. 1997), cert. denied, -- U.S. --, 118 S.Ct. 1526 (1998).

## VII. Constitutionality of the Death Penalty

The appellant concedes that the constitutionality of the death penalty has been upheld by the Tennessee Supreme Court, however, she raises the following issues in order to preserve them for later review. The appellant contends that (1) the death penalty statute fails to meaningfully narrow the class of eligible defendants[17]; (2) the prosecution has unlimited discretion in seeking the death penalty; (3) the death penalty is imposed in a discriminatory manner based upon economics, race, and geography; (4) there are no uniform standards for jury selection; (5) juries tend to be prone to returning guilty verdicts; (6) the defendant is denied the opportunity to address the jury's popular misconceptions about parole eligibility, cost of incarceration, deterrence, and method of execution; (7) the jury is instructed it must unanimously agree to a life sentence, and is prevented from being told the effect of a non-unanimous verdict; (8) courts fail to instruct the juries on the meaning and function of mitigating circumstances; (9) the jury is deprived of making the final decision about the death penalty; and (10) electrocution is cruel and unusual punishment.

These issues have repeatedly been rejected by our supreme court. See State v. Smith, 893 S.W.2d 908 (Tenn. 1994); State v. Brimmer, 876 S.W.2d 75 (Tenn. 1994); State v. Cazes, 875 S.W.2d 253 (Tenn. 1994); State v. Smith, 857 S.W.2d 1 (Tenn. 1993); Black, 815 S.W.2d at 188-190; State v. Boyd, 797 S.W.2d 589 (Tenn. 1990); State v. Teel, 793 S.W.2d 236 (Tenn. 1990); Thompson, 768

---

[17]Within this issue the appellant challenges Tenn. Code Ann. § 39-3-203(i)(2), (i)(5), (i)(6), and (i)(7). In this case, the State only relied upon Tenn. Code Ann. § 39-3-203(i)(4) and (i)(5). Therefore, the appellant is without standing to challenge (i)(2), (i)(6), and (i)(7). The constitutionality of (i)(5) is addressed previously in this opinion.

S.W.2d at 252-253.  See also State v. Keen, 926 S.W.2d 727 (Tenn. 1994).


## VIII.  Conclusion

For the foregoing reasons, we affirm the judgment of the Shelby County Criminal Court denying post-conviction relief.


IT IS ORDERED that the appellant's sentence of death by electrocution shall be carried out in the manner provided by law on December 10, 1999, unless otherwise stayed by an appropriate order.


_____
DAVID G. HAYES, Judge


CONCUR:


_____
DAVID H. WELLES, Judge


_____
NORMA MCGEE OGLE, Judge