# IN THE COURT OF CRIMINAL APPEALS OF TENNESSEE
## AT NASHVILLE
Assigned on Briefs January 11, 2011

## FRANK PEAKE, III v. STATE OF TENNESSEE

### Appeal from the Criminal Court for Putnam County
### No. 03-0820     Leon Burns, Judge

---

### No. M2010-01117-CCA-R3-PC - Filed April 19, 2011

---

The Petitioner, Frank Peake, III, appeals from the Putnam County Criminal Court's denial of his petition for post-conviction relief. In 2004, the Petitioner was convicted by a jury of aggravated assault and was, thereafter, sentenced to six years as a Range II, multiple offender. This Court affirmed the Petitioner's conviction on direct appeal. The Petitioner later filed a post-conviction petition and, following an evidentiary hearing, the post-conviction court denied relief. On appeal, the Petitioner argues that he received the ineffective assistance of counsel due to trial counsel's failure (1) to investigate and interview witnesses that would have corroborated his self-defense theory and (2) to request a limiting instruction as to the prior threat made by the Petitioner. Following our review of the record and the parties' briefs, we conclude that the Petitioner has not shown that he is entitled to relief. The judgment of the post-conviction court is affirmed.

**Tenn. R. App. P. 3 Appeal as of Right; Judgment of the Criminal Court Affirmed**

David H. Welles, J., delivered the opinion of the Court, in which JERRY L. SMITH and ROBERT W. WEDEMEYER, JJ., joined.

Samuel J. Harris, Cookeville, Tennessee, for the appellant, Frank Peake, III.

Robert E. Cooper, Jr., Attorney General and Reporter; Clark B. Thornton, Assistant Attorney General; William E. Gibson, District Attorney General; and Anthony Craighead, Assistant District Attorney General, for the appellee, State of Tennessee.

## OPINION

### Factual Background

Following a jury trial in July 2004, the Petitioner was convicted of aggravated assault. See Tenn. Code Ann. § 39-13-102(a)(1). Thereafter, the trial court sentenced the Petitioner to six years in prison as a Range II, multiple offender. See State v. Frank Peake, III, No. M2005-01674-CCA-R3-CD, 2006 WL 929296, at *1 (Tenn. Crim. App., Nashville, Apr. 11, 2006), perm. to appeal denied, (Tenn. Aug. 21, 2006). On direct appeal, this Court summarized the facts established at trial as follows:

> Jeff Burchett testified that, on the night of the crime, he worked as a security doorman at a bar, Cotton Eyed Joe's. He explained that he asked the [Petitioner] to leave the bar because the [Petitioner] was arguing with a woman, and the [Petitioner] was upset about this request. Burchett testified that Cotton Eyed Joe's had a policy against allowing people to argue in the bar. Burchett described how he got the [Petitioner] to leave the bar and, once outside the bar, another incident involving a different group of people drew Burchett's attention away from the [Petitioner]. Burchett explained that he, another security guard, and the bar manager spent two to three minutes dealing with this group of people, and he was hit on the head by an individual in this group. Burchett explained that, next, two people came up to him and said that there was a problem in the parking lot. He said that he and Dale Fox, his supervisor, walked to the parking lot and saw the [Petitioner] arguing with the [Petitioner's] girlfriend. Burchett said that, as he approached the [Petitioner] and his girlfriend, he could see their profiles. He explained that he saw the [Petitioner] back up and reach behind his back with his right hand, and then the [Petitioner] punched him and ran away. He recalled that the [Petitioner] first hit him in the ear. He chased the [Petitioner] until the [Petitioner] hopped over a fence. Next, he turned around and saw two police officers who told him that he had a bad cut and was bleeding. Burchett recalled that, approximately thirty to thirty-five seconds after the [Petitioner] hit him, he started to feel light headed and began staggering. He said that the police officers got him to the ground and started putting pressure on his neck. He testified that he was taken to the hospital by ambulance and received six stitches in his ear and twenty-seven stitches in his face. Burchett showed the scar which resulted from the incident to the jury. Burchett testified that he never put his hands on the [Petitioner].
>
> On cross-examination, Burchett testified that he had worked at Cotton Eyed Joe's for fourteen months. He explained that, although he had been

approved for security guard certification, he had not yet received the certification card. He acknowledged that fights were common at Cotton Eyed Joe's, and the bar has a sign at the door that prohibits guns and knives. Burchett explained that the security guards at Cotton Eyed Joe's do not pat down customers as they walk through the door, but if the guards see a customer with a knife, the guards ask the customer to take the knife out to the car. Burchett testified that he is six feet and three inches tall and that he weighs 300 pounds. He further testified that Dale Fox, a manager who is six feet tall and weighs two hundred and eighty pounds, accompanied him when he went to the parking lot to see the [Petitioner]. He acknowledged that, when they first saw the [Petitioner] in the parking lot, the [Petitioner's] attention was focused on his girlfriend. He acknowledged that he did not see the [Petitioner] cut him and did not see a knife in the [Petitioner's] hand. He testified that the first time that he became aware of his cut was after he chased the [Petitioner].

William Randall Wofford testified that, on the night of the crime, he was working as a doorman at Cotton Eyed Joe's. He watched as the [Petitioner] was escorted out of the bar and described the [Petitioner] as "very threatening in demeanor." He further testified that, after being asked to leave, the [Petitioner] remained outside in the patio area. Wofford told the [Petitioner] that he had to leave the premises, and the [Petitioner] responded that he had a knife and that he was going to cut Wofford. Wofford explained that the [Petitioner] reached in his pockets as he threatened Wofford, but Wofford never saw the [Petitioner] pull anything out of his pockets because the [Petitioner's] girlfriend pulled the [Petitioner] away.

On cross-examination, Wofford testified that he asks customers to lift their shirts or jackets as they enter Cotton Eyed Joe's and asks customers with knifes or clips to take those items back to their car. He further testified that he sometimes asks customers to empty their pockets if he suspects that a knife is inside their pockets. He said that he did not call the police after the [Petitioner] threatened him.

Officer Craig Wilkerson, a patrol officer with the Cookeville Police Department, testified that, on the night of the crime, he arrived at Cotton Eyed Joe's to address an unrelated incident, when he saw the [Petitioner] running. Officer Wilkerson described how, when Burchett and Fox walked away from the [Petitioner] and towards the police officers, he saw that Burchett had a cut with blood gushing out of it. Officer Wilkerson immediately notified Dispatch to get an ambulance to Cotton Eyed Joe's because Burchett had suffered a

severe laceration, and Officer Wilkerson was concerned that the victim "may not make it." He said that Officer Lense and Officer Johnson chased the [Petitioner] and that some police officers searched the area but could not find a weapon.

On cross-examination, Officer Wilkerson testified that the manager of Cotton Eyed Joe's alerted him to the altercation involving the [Petitioner] in the parking lot. He acknowledged that he first saw Burchett after Burchett had run after the [Petitioner], and the blood from the victim's cut may have started to spurt because Burchett had been running.

Officer Jeff Johnson testified that he is a canine officer with the Cookeville City Police Department. He testified that, when he arrived at the crime scene, he saw two security officers standing with the [Petitioner] and saw the [Petitioner] hit Burchett and then run away and jump over a fence. The Officer said that he ran parallel to where the [Petitioner] had jumped the fence in pursuit of the [Petitioner]. He said that he saw another police officer who ran down the streets parallel to where the [Petitioner] had climbed the fence. He explained that he ran past Burchett, and, as he was doing so, Officer Wilkerson said that Burchett had been cut. Officer Johnson explained that, next, he received notice from Lieutenant Webb that Lieutenant Webb had found the [Petitioner], and he went to Lieutenant Webb's location and saw the [Petitioner] on the ground. Officer Johnson then retrieved his canine and searched the surrounding area for approximately one hour but did not find a weapon. On cross examination, he explained that he could not search areas that were inaccessible to dogs such as roof tops.

Lieutenant Mark Webb testified that he is a supervisor on third shift for the Cookeville Police Department. He explained that, on the night of the crime, he received a call about the situation at Cotton Eyed Joe's that described the incident involving the [Petitioner], the [Petitioner's] physical description, and the direction in which the [Petitioner] was heading. He drove towards that area and turned the lights out in his vehicle, and he saw an individual who fit the [Petitioner's] description. He turned on the vehicle's lights, got out of the vehicle, told the [Petitioner] to stop, and the [Petitioner] got down on the ground. He said that he searched the area where the [Petitioner] was arrested for a weapon.

On cross-examination, Lieutenant Webb testified that the [Petitioner] had blood on his clothing. He acknowledged that an officer searched the

-4-

[Petitioner] and did not find a weapon, but he did not recall discussing a knife with the [Petitioner].

Tamera Verble testified that, on the night of the crime, she saw the [Petitioner] at Cotton Eyed Joe's and got angry because he was talking to another woman. She said that she pulled him up to the front of the club and began arguing with him. She acknowledged that she and the [Petitioner] were told to leave the club. She said that, once outside the club, a different group of people got into a fight with each other. She explained that the police came when the fight broke out, and she and the [Petitioner] went to the parking lot where they continued to argue. Verble said that she saw two security officers approach them, but the [Petitioner] did not see them because he was not facing the parking lot. She said that the security guards approached the [Petitioner], that the [Petitioner] tried to pull away from the officers, and that the security guards went running after the [Petitioner].

On cross examination, Verble testified that, on the night of the crime, she was dating the [Petitioner] and that he is the father of her daughter. She said that she got a ride to Cotton Eyed Joe's with the [Petitioner's cousin's wife], and the [Petitioner] got a ride to Cotton Eyed Joe's with someone else. She explained that she and the [Petitioner] were not arguing loudly when they were asked to leave Cotton Eyed Joe's. She said that they could not leave the premises because they did not have a car. She further testified that she was with the [Petitioner] the whole time, and she did not see the [Petitioner] argue with Wofford. She explained that they never tried to go back into Cotton Eyed Joe's after they were first told to leave because a fight erupted outside the bar. She explained that she and the [Petitioner] decided to go to the parking lot. She said that she only saw the [Petitioner] swing at Burchett in an attempt to get away and that she did not see the [Petitioner] swing at Burchett in order to actually hit him.

Id. at *1-3. Our supreme court denied the Petitioner's application for permission to appeal.

The Petitioner then filed a pro se petition for post-conviction relief on February 6, 2007. Counsel was appointed to represent the Petitioner.[1] The Petitioner argued that he was denied the effective assistance of counsel at trial. Specifically, he claimed that trial counsel (1) "failed to call a key witness to the witness stand that could have provided a self-defense claim for the [Petitioner]"; (2) "failed to make an opening statement that could have had an

---

[1] After numerous substitutions of counsel, no amended petition was filed.

affect [sic] on the jury"; and (3) "failed to use self-defense as a defense for the [P]etitioner." A hearing was held on May 26, 2009.

Defense Attorney Edwin Sadler[2] was first to testify. Mr. Sadler represented the Petitioner at his preliminary hearing but, due to the Petitioner's indigency status, the public defender was thereafter appointed to represent the Petitioner. However, after being paid some money by the Petitioner's family, Mr. Sadler agreed to assist the public defender in trying the case. Mr. Sadler did perform his own investigation of the Petitioner's case and did work alongside the public defender at the Petitioner's trial. According to Mr. Sadler, they made the court aware of this arrangement so as to avoid any potential problems, and Mr. Sadler did not believe there was ever any confusion about which attorney was lead counsel on the case.

Mr. Sadler testified that the public defender's investigator, Mr. Bob Lynch, aided him in conducting witness interviews. According to Mr. Sadler, when he went to talk with the witnesses, he discovered that the public defender's office had already spoken with them. Mr. Sadler opined that the public defender's office "had done a very adequate job of preparing the defense . . . in advance . . . ." Mr. Sadler recalled speaking with the Petitioner's girlfriend and the victim in this case; he did not remember ever interviewing the Petitioner's cousin or that cousin's wife.

When Mr. Sadler was asked what the trial strategy was for the Petitioner, Mr. Sadler stated that "[t]here were two strategies: number one was self-defense, and the other, the other defense was, that he just didn't do it." After recounting his understanding of the incident at Cotton Eye Joe's, Mr. Sadler said,

> It was our contention that he either, the victim was either cut in the initial fight that he had broke from, or . . . that this gentlemen cut himself where they were scuffling on that broken mirror on a pickup truck. But in either event, that was our defense. And that . . . nobody who saw [the Petitioner] cut him, no one saw a knife, no knife was found, it was a jury question.

Mr. Sadler opined that "the proof went just as good as we could have. . . . [E]verything basically went in like we thought it would." Mr. Sadler did not recall any issue with the jury instructions.

---

[2] At the time of the post-conviction hearing, Mr. Sadler was employed as an assistant district attorney general in Wilson County.

When asked about how the defense theory was presented to the jury, Mr. Sadler testified that the proof came through cross-examination of the bouncers and the officers and through the testimony of the Petitioner's girlfriend. "I remember our general defense was the fact that these two large men were charging [the Petitioner] and his girlfriend, and they were out in the parking lot not doing anything that would cause that sort of a reaction." Moreover, they arduously focused on the fact that a knife was never found.

Mr. Sadler did not believe that testimony from the Petitioner's cousin or the cousin's wife "would have made any dramatic change to [the] case either way."

Trial counsel, public defender Marshall Judd, testified that he was appointed to represent the Petitioner after the case went to criminal court.[3] After Mr. Sadler joined the case, both lawyers spoke with the Petitioner and advised him of the joint representation.

Trial counsel said that he obtained discovery materials from the State and reviewed the preliminary hearing tape. He and his investigator, Mr. Lynch, went to the prison and spoke with the Petitioner, providing him with all discovery materials including a copy of the tape, which the Petitioner assured "he had the facilities to play it down there." After discussing the case with the Petitioner, Mr. Lynch began to conduct his investigation. During the investigation, trial counsel accompanied Mr. Lynch to Cotton Eye Joe's to observe the scene. They "walked the route that [the Petitioner] was supposed to have taken[,] . . . that the police had testified to and the discovery had shown, and . . . [that] numerous Cookeville police officers had thoroughly searched and were not able to find the knife."

Trial counsel did not recall the Petitioner or his girlfriend providing the names of any additional witnesses, but trial counsel believed that, if they had, Mr. Lynch would have talked to those witnesses "if he could have." As for the Petitioner's cousin, Mr. Floyd Cartwright, trial counsel thought he was in jail at the time and that they "explained that inmates don't make real good witnesses in front of juries." He could not remember if he or Mr. Lynch ever interviewed Mr. Cartwright or his wife; however, he did state that Mr. Lynch was "very thoroughly familiar with Mr. Cartwright[.]" If necessary, trial counsel "would have asked for a motion to continue to get witnesses, if . . . they would have been of any benefit."

When asked how they presented the Petitioner's defense, trial counsel said through the Petitioner's girlfriend and by "aggressive cross-examination" of the State's witnesses. Trial counsel testified that both he and Mr. Sadler advised the Petitioner about whether he

---

[3] For the sake of clarity, we will summarize the testimony of the witnesses in a different order than they were called at the post-conviction hearing.

should testify on his own behalf, but that the ultimate decision was the Petitioner's. Trial counsel spoke of multiple meetings with the Petitioner, some lasting "for quite some time."

Trial counsel confirmed that a theory of self-defense and defense of others was argued to the jury. Moreover, the fact that a knife was never found "was very strongly argued to the jury as well[.]" When asked about the jury instructions, trial counsel thought "the general self-defense instruction was probably requested," but he did not remember any special request.

Tamara Verble testified that she was the Petitioner's girlfriend in 2004 and was still his girlfriend at the time of the post-conviction hearing; the two having a five-year-old child together. Ms. Verble did remember being interviewed by Mr. Sadler and another gentleman prior to trial. She did not think she was ever interviewed by trial counsel. She also recalled talking to Mr. Sadler on the day of the Petitioner's trial.

Ms. Verble said that she went to Cotton Eye Joe's with the Petitioner's cousin's wife and that the Petitioner arrived at the bar with his cousin. Ms. Verble first stated that she did not believe that the Petitioner's cousin or the cousin's wife were in the parking lot at the time of the fight. She later clarified, "If anything, they could have been on the sidewalk during that fight."

The Petitioner testified that he had two prior convictions for aggravated assault and aggravated burglary and that he was on parole at the time of this incident. His parole was revoked, and he was incarcerated following his arrest on these charges. The Petitioner stated that he was represented by the public defender in general sessions court and, following his indictment, that representation continued into criminal court. He said that his family later hired Mr. Sadler.

He did not remember ever meeting with trial counsel, except in the courtroom. The Petitioner stated that neither his lawyers nor Mr. Lynch ever came to see him while he was in prison to talk about the case. He testified that, after he was transferred to the county jail for trial, someone came and relayed a plea offer to him of five years at 30%, but that neither lawyer came to him while he was in the county jail to discuss the case. Later in his testiomny he admitted that he did talk about the circumstances of the case with Mr. Sadler at some point.

The Petitioner testified that, after his incarceration, he relayed the circumstances surrounding the incident to someone with the public defender's office but that he did not believe it was Mr. Lynch. If anyone had asked him about potential witnesses, he would have told them about his cousin, Floyd Cartwright, and Mr. Cartwright's wife, who were in the

parking lot when the incident occurred. He believed Mr. and Mrs. Cartwright followed them out to the parking lot soon after the Petitioner and Ms. Verble were kicked out of the bar. When asked if he spoke with Mr. Cartwright or his wife after the incident, the Petitioner said, "I never seen them again." The Petitioner believed that, if proper investigation had been done, there "would have been plenty of witnesses." The Petitioner also believed that his lawyers should have reviewed the victim's statements at the emergency room, where the victim stated that "he had attempted to restrain a man is how he received his injury."

The Petitioner confirmed that he did not testify on his own behalf due to his prior convictions; however, he now regretted that decision. The Petitioner testified that, at trial, he asked his lawyers what other witnesses were they going to call to support his story. After he was told that they were only going to call one witness in his defense, the Petitioner asked, "What about all the other ones?" The Petitioner believed he told his lawyers about Floyd Cartwright.

After reviewing the evidence presented, the post-conviction court denied relief. This appeal followed.[4]

**Analysis**

On appeal, the Petitioner contends that trial counsel failed to provide the effective assistance of counsel guaranteed him by the United States and Tennessee constitutions at trial. To sustain a petition for post-conviction relief, a petitioner must prove his or her factual allegations by clear and convincing evidence at an evidentiary hearing. See Tenn. Code Ann. § 40-30-110(f); Momon v. State, 18 S.W.3d 152, 156 (Tenn. 1999). Upon review, this Court will not reweigh or re-evaluate the evidence below; all questions concerning the credibility of witnesses, the weight and value to be given their testimony, and the factual issues raised by the evidence are to be resolved by the post-conviction judge, not the appellate courts. See Momon, 18 S.W.3d at 156; Henley v. State, 960 S.W.2d 572, 578-79 (Tenn. 1997). The

_____

[4] The State argues that we should dismiss the appeal because the Petitioner's notice of appeal document was not timely filed. The post-conviction court orally denied relief at the conclusion of the hearing, and an order of dismissal was filed on June 3, 2009. Although a motion is not included in the appellate record, apparently the Petitioner, pro se, moved to set aside the June 3 order so that he could file a timely notice of appeal. In an amended order filed on April 28, 2010, the post-conviction court granted the Petitioner's request, stating that, "[f]or reasons unknown at this time, counsel failed to filed a notice of appeal." The notice of appeal document was then filed on May 20, 2010. While the State correctly notes that the post-conviction court had no authority to alter the judgment once it became final in order to waive the late-filing of the notice appeal, the notice of appeal document is not jurisdictional. See Tenn. R. App. P. 4(a). In view of the action taken by the post-conviction court after reviewing the Petitioner's motion and because post-conviction counsel seemingly waived the Petitioner's appeal unilaterally, we too will waive the timely filing of such document in the interest of justice.

post-conviction judge's findings of fact on a petition for post-conviction relief are afforded the weight of a jury verdict and are conclusive on appeal unless the evidence preponderates against those findings.  See Momon, 18 S.W.3d at 156; Henley, 960 S.W.2d at 578.

As specific grounds of ineffectiveness, the Petitioner makes the following claims: (1) Trial counsel was ineffective for failing to investigate and interview witnesses that would have corroborated his theory of self-defense; and (2) Trial counsel was ineffective for failing to request an instruction limiting the purposes for which the jury could consider testimony about a prior threat made by the Petitioner, thus, prejudicing his self-defense theory.  The Sixth Amendment to the United States Constitution and article I, section 9 of the Tennessee Constitution guarantee a criminal defendant the right to representation by counsel.  State v. Burns, 6 S.W.3d 453, 461 (Tenn. 1999); Baxter v. Rose, 523 S.W.2d 930, 936 (Tenn. 1975).  Both the United States Supreme Court and the Tennessee Supreme Court have recognized that the right to such representation includes the right to "reasonably effective" assistance, that is, within the range of competence demanded of attorneys in criminal cases.  Strickland v. Washington, 466 U.S. 668, 687 (1984); Burns, 6 S.W.3d at 461; Baxter, 523 S.W.2d at 936.

A lawyer's assistance to his or her client is ineffective if the lawyer's conduct "so undermined the proper functioning of the adversarial process that the trial cannot be relied on as having produced a just result."  Strickland, 466 U.S. at 686.  This overall standard is comprised of two components: deficient performance by the defendant's lawyer and actual prejudice to the defense caused by the deficient performance.  Id. at 687; Burns, 6 S.W.3d at 461.  To demonstrate prejudice, a defendant must show "a reasonable probability that but for counsel's unprofessional errors, the result of the proceeding would have been different."  Strickland, 466 U.S. at 694.  The defendant bears the burden of establishing both of these components by clear and convincing evidence.  Tenn. Code Ann. § 40-30-110(f); Burns, 6 S.W.3d at 461.  The defendant's failure to prove either deficiency or prejudice is a sufficient basis upon which to deny relief on an ineffective assistance of counsel claim.  Burns, 6 S.W.3d at 461; Goad v. State, 938 S.W.2d 363, 370 (Tenn. 1996).

In evaluating a lawyer's performance, the reviewing court uses an objective standard of "reasonableness."  Strickland, 466 U.S. at 688; Burns, 6 S.W.3d at 462.  The reviewing court must be highly deferential to counsel's choices "and should indulge a strong presumption that counsel's conduct falls within the wide range of reasonable professional assistance."  Burns, 6 S.W.3d at 462; see also Strickland, 466 U.S. at 689.  The court should not use the benefit of hindsight to second-guess trial strategy or to criticize counsel's tactics, see Hellard v. State, 629 S.W.2d 4, 9 (Tenn. 1982), and counsel's alleged errors should be judged in light of all the facts and circumstances as of the time they were made, see Strickland, 466 U.S. at 690; Hicks v. State, 983 S.W.2d 240, 246 (Tenn. Crim. App. 1998).

A trial court's determination of an ineffective assistance of counsel claim presents a mixed question of law and fact on appeal. Fields v. State, 40 S.W.3d 450, 458 (Tenn. 2001). This Court reviews the trial court's findings of fact with regard to the effectiveness of counsel under a de novo standard, accompanied with a presumption that those findings are correct unless the preponderance of the evidence is otherwise. Id. "However, a trial court's conclusions of law—such as whether counsel's performance was deficient or whether that deficiency was prejudicial—are reviewed under a purely de novo standard, with no presumption of correctness given to the trial court's conclusions." Id. (emphasis in original).

At the conclusion of the hearing, the post-conviction court made detailed findings and found that the Petitioner received the effective assistance of counsel. The post-conviction court reasoned as follows:

> [The Petitioner] has to show by clear and convincing evidence that there might have been something done that would have probably changed the outcome of the trial, and has the burden of showing that counsel was participating at a level lower than the standard of a competent lawyer, and that that ineffectiveness, or incompetence, on certain issue prejudiced the [Petitioner].
>
> Your claim here states that: One, "Failed—the [P]etitioner's counsel failed to call a key witness to the witness stand that could have provided a self-defense claim for the [Petitioner]." I'm not sure who that key witness is. That witness is not here today that I know of.
>
> Ms. Verble testified at trial, she testified here today, so I assume we're talking about somebody else.
>
> If it's Mr. Cartwright, he is alluded to being in prison, and I do recall a subsequent case in which Mr. Cartwright was convicted.
>
> The other witness, a girlfriend, is not here to testify, so I don't know what she would have said that would not have—that would have been any better help to you than what you had.
>
> Counsel testified that the self-defense concept was presented about as well as they thought it could be, and felt comfortable with the way the proof was coming in; that you were defending yourself as they were coming towards you, but you did not have a knife. As counsel said, the jury didn't believe that, but they couldn't think of anything they should have done that was any better

than what happened the way it happened, the way they presented it. So, I don't see any proof here today that would suggest that counsel failed to call a key witness that would have probably affected the outcome of the trial. The defense was presented of self-defense.

You also make a statement here, that an opening statement by counsel, they failed to make an opening statement that could have had an effect on the jury. There's no proof of that. Certainly that's just conjecture. We don't know what—whether that had any impact or not, so that certainly is not grounds for post-conviction relief.

Your other petition claiming, your petition says, "They failed to use self-defense as a defense." Well, that's certainly not the case, as counsel and everyone here agrees that self-defense was presented in your behalf. No knife was ever found. So that was part of the—the defense, "That I was defending myself from these people coming toward me, and I didn't have a knife, and they never found a knife. So, how is it they're blaming me for having a knife? I never had one." Well, that certainly was the inference given, even though you did not testify, that they never found a knife. "It couldn't have been on the [Petitioner], because he—we traced where he ran, and nothing was found in the area," so.

I cannot say that there's a missing witness out there who should have been called at the trial that would have made a difference in the outcome of the trial, so I cannot say that counsel was ineffective. Counsel could always do something better or different than what they did, when we look back in hindsight, but counsel testified that they did interview you, they did talk to you, contrary to your evidence, your statement today, but they said they did, and reviewed the case, and I would have to say that counsel was not ineffective. Counsel provided reasonable effective counsel under the circumstances, and you were not denied any Sixth Amendment [r]ight of ineffective assistance of counsel.

The Petitioner argues that trial counsel failed to investigate and present witnesses at trial who would have corroborated his defense theory, particularly his cousin, Floyd Cartwright, and Mr. Cartwright's wife. The Petitioner acknowledges that these witnesses were not presented at the post-conviction hearing. In Black v. State, this Court stated, "When a petitioner contends that trial counsel failed to discover, interview, or present witnesses in support of his defense, these witnesses should be presented by the petitioner at the evidentiary hearing." 794 S.W.2d 752, 757 (Tenn. Crim. App. 1990); see also Owens v.

State, 13 S.W.3d 742, 756 (Tenn. Crim. App. 1999) ("[P]roof of deficient representation by omission requires more than a speculative showing of a lost potential benefit."). Also, we note that trial counsel testified that his investigator, Mr. Lynch, was familiar with Mr. Cartwright and that Mr. Cartwright, an inmate, would not have made a very credible witness. The post-conviction court declined to speculate on what testimony these witnesses might have given.

Morever, the Petitioner's lawyers thoroughly cross-examined the State's witnesses at trial and put Ms. Verble on the stand to detail the Petitioner's version of the events. Mr. Sadler testified, "[W]e felt like there was . . . nobody who saw [the Petitioner] cut him, no one saw a knife, no knife was found, it was a jury question." He further opined that "the proof went just as good as we could have. . . . [E]verything basically went in like we thought it would." We agree with the post-conviction court that the Petitioner has not shown ineffective assistance of counsel.

As for the Petitioner's claim concerning counsel's failure to request a special limiting instruction on the use of a witness's testimony, the Petitioner did not make this assertion or argument in his petition or at the evidentiary hearing. Thus, the issue is waived due to the Petitioner's failure to include it in his petition or raise it in the post-conviction court. See Tenn. Code Ann. § 40-30-104(d) ("The petitioner shall include all claims known to the petitioner for granting post-conviction relief and shall verify under oath that all such claims are included."); -106(g) ("A ground for relief is waived if the petitioner personally or through an attorney failed to present it for determination in any proceeding before a court of competent jurisdiction in which the ground could have been presented."). The issue may not be presented for the first time on appeal. This Court is precluded from addressing this claim. See, e.g., Charles Orlando Fields v. State, No. W2003-02051-CCA-R3-PC, 2004 WL 1405012 (Tenn. Crim. App., Jackson, June 23, 2004).

**Conclusion**

Based upon the foregoing reasoning and authorities, we affirm the judgment of the post-conviction court.

_____
DAVID H. WELLES, JUDGE

-13-