# IN THE COURT OF CRIMINAL APPEALS OF TENNESSEE
## AT NASHVILLE
### Assigned on Briefs February 15, 2011

## ROBERT S. WILSON v. STATE OF TENNESSEE

**Appeal from the Circuit Court for Marion County**
**No. 7868     J. Curtis Smith, Judge**

---

### No. M2010-00764-CCA-R3-PC - Filed May 3, 2011

---

Following a jury trial, the Petitioner, Robert S. Wilson, was convicted of attempted aggravated sexual battery and rape of a child. This Court affirmed his convictions on direct appeal. The Petitioner filed a timely petition for post-conviction relief and, after a hearing, the post-conviction court denied relief. In this appeal, the Petitioner claims that he was denied effective assistance of counsel because Trial Counsel: (a) failed to adequately meet with him prior to the trial and investigate his case; (b) failed to adequately cross-examine the victim, the victim's brother, and the victim's mother; and (c) failed to adequately convey the State's plea offer such that the Petitioner could make an informed and knowledgeable decision. Additionally, the Petitioner contends that the cumulative effect of Trial Counsel's alleged deficiencies amounted to ineffective assistance of counsel. After our review, we affirm the post-conviction court's denial of relief.

**Tenn. R. App. P. 3 Appeal as of Right; Judgment of the Circuit Court Affirmed**

DAVID H. WELLES, J., delivered the opinion of the Court, in which THOMAS T. WOODALL and ROBERT W. WEDEMEYER, JJ., joined.

Samuel F. Hudson, Dunlap, Tennessee, for the appellant, Robert S. Wilson.

Robert E. Cooper, Jr., Attorney General and Reporter; Lindsy Paduch Stempel, Assistant Attorney General; J. Michael Taylor, District Attorney General; and Sherry Shelton, Assistant District Attorney General, for the appellee, State of Tennessee.

# OPINION

## Factual Background

In the Petitioner's direct appeal, this Court summarized the facts underlying his convictions as follows:

In 2000, Susan Audr[ia] Condra, the mother of the minor female victim, separated from her husband and, after a month, began a romantic relationship with the [Petitioner]. Within two months, the [Petitioner] had moved into the residence that Ms. Condra shared with her son, her mother, her stepfather, and the victim, C.C. Approximately, five months later, the [Petitioner], Ms. Condra, and the children moved into the residence of the [Petitioner's] mother, where they lived for approximately two months. From there, Ms. Condra moved with the [Petitioner] and her children into a room at Ridley's Motel. Ms. Condra and the children referred to the residence at the motel as "the one room shack." The family lived at the motel on two separate occasions, the first time in August and September of 2000 and the second from November of 2000 to February of 2001. During the month of October 2000, the family stayed at the residence of Ms. Condra's father. From "the one room shack," Ms. Condra, her children, and the [Petitioner] moved into "the big apartment," which was located in a housing project. In August of 2001, the victim and her brother were removed from Ms. Condra's custody by the Department of Children's Services. Later, Ms. Condra's parental rights were terminated and at the time of trial, the children were living with a foster family.

Ms. Condra testified that when she was dating the [Petitioner], she drank alcohol every day until she passed out. She stated that the [Petitioner] also drank heavily during their relationship. Ms. Condra recalled that on one occasion in March or April of 2001, while the family was living in "the big apartment," she awoke in the middle of the night and heard the victim scream, "No." Ms. Condra stated that when she looked into the bathroom, she saw the victim facing the [Petitioner] and "sitting up partly on the floor." The [Petitioner] had his hand on the back of the victim's head. When she tried to open the door fully, the [Petitioner] prevented her from doing so.

Ms. Condra also testified that on the victim's seventh birthday, the victim was wearing shorts and a bathing suit. She recalled leaving the residence to purchase items for the birthday celebration and when she returned, she found that the victim's bathing suit had been torn and that she was no longer wearing her shorts.

The victim, C.C., who was born on June 9, 1994, testified that on her seventh birthday, while the family was living in "the big apartment," the [Petitioner] forced her to perform oral sex. C.C. recalled that she was playing checkers with her older brother when the [Petitioner] directed her to the living room. According to C.C., the [Petitioner], who was seated on the couch, ordered her to "suck his thing," which, she said, looked like "a worm." C.C. recalled another incident at "the big apartment" when the [Petitioner] pulled her into the bathroom and forced her to perform oral sex. She remembered that her mother tried to open the bathroom door but the [Petitioner] "push[ed] on it to where she couldn't open it." C.C. testified that on a third occasion, when the family was living in "the one room shack," the [Petitioner] "came to my bed and was pulling on my feet and he made me suck his thing." She stated that on each occasion, the [Petitioner] instructed her to "suck it like a lollipop."

C.C. also testified that while the family was living in "the big apartment," the [Petitioner] had penetrated her anally twice. She stated that on the first occasion, her mother had gone to visit a relative and "[the Petitioner] told [J.C.] to go outside and do something and . . . [the Petitioner] took me to my mom's room and he put it up my butt." C.C. recalled that on that occasion, she "had to use the bathroom very bad and [the Petitioner] wouldn't let [her] go and when he got finished the[re] was crap on it." As to the second occasion, C.C. remembered that she was playing checkers with her brother when the [Petitioner] called her into the living room, forced her to lean over a chair, and then "put his thing up my butt ." C.C. testified that the [Petitioner] penetrated her vaginally while they lived at "the big apartment." She stated that as the [Petitioner] was "[t]rying to put his private up [her]," she was "trying to get [the Petitioner] away from [her] and [she] was kicking."

[J.C.], the victim's older brother, corroborated the incident that occurred on the victim's seventh birthday. He remembered hearing the [Petitioner] tell the victim to "suck it." He and the victim had been playing checkers and when she did not return immediately, [J.C.] walked toward the living room and looked through a hole in the quilt that the family used to divide the living room from the rest of the apartment. He then saw the [Petitioner] seated on a chair with the victim on her knees in front of him. [J.C.] testified that both were nude and the [Petitioner's] penis was in the victim's mouth. He explained that he did not report the incident to his mother because he was afraid of the [Petitioner], who had beaten him on previous occasions.

Kathy Spada, a nurse practitioner at The Children's Advocacy Center, performed a physical examination of the victim in October 2001. Ms. Spada testified that although the victim's hymen was intact, such a finding did not necessarily mean that there had been no vaginal penetration. She stated that there were no fissures around the victim's rectal area and that the victim had no loss of tone. During cross-examination, Ms. Spada acknowledged that neither the victim's vagina nor anus showed visual signs of trauma such as scarring or healing wounds.

At the close of its proof, the [S]tate made an election of the incidents upon which it was relying for conviction. As to count one, wherein the [Petitioner] was charged with aggravated sexual battery, the prosecution announced reliance on the incident of oral sex that occurred in the bathroom of "the big apartment" as described by the victim and her mother. As to count two, the state chose to rely on the incident of oral sex that occurred on the victim's seventh birthday.

The [Petitioner's] mother, Helen Wilson, testified on behalf of the defense. Ms. Wilson recalled that the [Petitioner], Ms. Condra, and the two children came to live with her in June of 2000 because they had nowhere else to go. She testified that she asked them to leave two months later because the children were "on [her] nerves." Ms. Wilson remembered that she warned her son that "if he didn't get away from that girl and them two kids he was going to end up in trouble." According to Ms. Wilson, the victim and her brother "loved [the Petitioner] and he loved them." She claimed that the victim called the [Petitioner] "daddy" and that he often helped her with her homework.

Kelly Butram, an employee of the Department of Children's Services, testified that on August 31, 2001, he received a call from the police, who reported that the [Petitioner] had beaten the victim's brother. He stated that although he did not interview the victim with regard to her claims of sexual abuse, the allegations first came to light during his investigation of the August 31 incident. Butram, who sat in on the interview of the victim conducted by employees of the Children's Advocacy Center, testified that the children were removed from their mother as a result of the beating and that her parental rights were later terminated.

The [Petitioner] testified that he began dating the victim's mother in January of 2000 but that they did not start living together until June of that same year. He stated that they first lived with his mother, then with a friend

-4-

of his, then at Ridley's Motel, then with Ms. Condra's father, then again at Ridley's Motel, and finally at a housing project in South Pittsburg. According to the [Petitioner], he and Ms. Condra had a rocky relationship but he chose not to leave because of his concern for the children. The [Petitioner] testified that on the victim's seventh birthday, Ms. Condra took the victim to get her ears pierced and the family had a cookout. He denied having any sort of sexual contact with the victim on that or any other day. The [Petitioner], who claimed to be a father figure to the children, admitted beating the victim's brother with a belt, explaining that he was "flustered." He contended that the victim's mother claimed to have been sexually abused as a child and often discussed the abuse in front of the victim.

State v. Robert Wilson, No. M2004-00110-CCA-R3-CD, 2005 WL 292434, at *1-3 (Tenn. Crim. App., Nashville, Feb. 4, 2005), perm. to appeal denied, (Tenn. June 27, 2005) (designated "not for citation") (footnote omitted).

In his direct appeal, this Court affirmed the Petitioner's convictions but modified both of his sentences. The Petitioner filed a petition for post-conviction relief, as well as two subsequent amended petitions, and claimed, among other things, that he was denied effective assistance of counsel. An evidentiary hearing was conducted on January 10, 2010.

The Petitioner testified that Carla Newman, Ms. Condra's sister, who initially took care of the victim and her brother after they were removed from their mother's custody, told the children that, if they did not say that the Petitioner did something bad to them, she would put them in foster care. He said that he informed Trial Counsel about this information.

The Petitioner recalled that he received multiple letters from Ms. Condra while he was in jail awaiting trial on the instant offenses, indicating that she wanted to get back together with him. He said that, based on those letters, he did not expect Ms. Condra to testify against him during his trial and that he did not know she was going to testify about witnessing the "bathroom episode" until Trial Counsel told him when the trial started. The Petitioner stated that he gave Trial Counsel the letters he received from Ms. Condra.

The Petitioner testified that Trial Counsel conveyed a twelve-year plea offer to him on the first day of his trial and that, even though he knew he could receive a sentence of forty or fifty years, he rejected the offer. The Petitioner claimed that, at that time, Trial Counsel did not inform him that Ms. Condra would be testifying for the State. He also testified that, at the time he rejected the plea offer, he was under the impression that Ms. Spada's report "shot down the allegations" of vaginal and rectal penetration. The Petitioner claimed that Trial Counsel never explained the doctrine of election to him, nor did Trial Counsel inform

him that the State could convict him based solely on the allegations of oral sex. The Petitioner said that, if he knew he could be convicted solely on allegations of oral sex, "[i]t would have made [him] think" about accepting the plea offer.

The Petitioner recalled that the victim had made allegations of sexual misconduct against her biological father but that, after an investigation, he was never criminally charged. The Petitioner said that he thought Trial Counsel was going to have the victim's father testify and that Trial Counsel would cross-examine the victim about the allegations she made against her father.

The Petitioner testified that, when Trial Counsel informed him about the victim's brother's allegations that he witnessed the victim perform oral sex on the Petitioner through a curtain, he told Trial Counsel that the victim's brother could not have seen what he alleged because it would have been impossible due to the layout of the apartment. The Petitioner said that he felt the victim's brother, who gave detailed testimony during the trial, had been coached and that Trial Counsel did not ask him "the proper questions."

On cross-examination, the Petitioner acknowledged that, in addition to the instant offenses, he had fifteen other convictions. He also stated that his decision to plead not guilty was based on the fact that he was innocent and elaborated, "I didn't know that it was going to be like this, when you don't got proper representation and you don't ask the questions."

Trial Counsel testified that he had been practicing law for thirty-seven years and had conducted over 100 jury trials. He said that, other than capital murder trials, he believes aggravated sexual battery and rape of a child cases are the most difficult to defend. Although he did not recall how many times he had met with the Petitioner to prepare for trial, Trial Counsel said that, during the period in which the Petitioner was incarcerated, they met frequently. He also said that, after the Petitioner was released on bond, Trial Counsel did not see him as much because the Petitioner told him that he needed to work and could not come to Trial Counsel's office.

Trial Counsel recalled that he was most concerned about the testimony of the victim and her brother and the impact their testimony would have on the jury. In fact, he testified that the victim's brother "is probably the only witness that I can think of in 37 years who seemed unshakable." Trial Counsel said that he and the Petitioner discussed the victim's brother's claims that he saw the victim and the Petitioner engage in sexual activity. Trial Counsel stated that he went to the apartment complex where the incident was alleged to have occurred and looked at how the windows were positioned, but did not go inside the unit.

Trial Counsel recalled that he subpoenaed the victim's father and planned to ask him about the allegations that the victim had also made against him. However, he decided not to call him as a witness and explained, "I kept thinking if I put him on he's going to deny that and jurors might conclude either that we were trying to shift the blame to somebody else or try to excuse conduct, by saying, well, it's been done before, so what." He said he made a tactical decision not to call the victim's father as a witness.

Trial Counsel testified that he decided not to ask the victim about her prior allegations that her father sexually abused her because doing so would open the door to allow the State to question her about other statements included in the forensic interviewer's report. He was particularly worried about the introduction of one part of the report, in which the victim compared the penises of the Petitioner and her father. Further, Trial Counsel stated that he did not know for sure that the victim's allegations against her father were false, as all he knew was that her father was not criminally charged in connection with the victim's allegations. When dealing with young children as witnesses, Trial Counsel explained, "[T]he last thing I want to do is to get that child crying in a courtroom. So my approach to deal with them is try to be conversational rather than accusatory."

Regarding the letters the Petitioner received from Ms. Condra, Trial Counsel stated that he had seen the letters, and he explained that he did not use the letters to impeach Ms. Condra because they were undated and that he thought he could better impeach her with her prior sworn testimony from her parental rights termination hearing.

Trial Counsel testified that he knew that Ms. Newman, the victim's aunt, was employed by the Department of Children's Services and that she briefly took care of the children after they were removed from Ms. Condra's custody. However, he did not recall whether the Petitioner told him that he heard from Ms. Condra that Ms. Newman threatened to put the children in foster care if they did not tell authorities that the Petitioner had done something bad to them.

He acknowledged that he did not interview Ms. Condra before the trial, but Trial Counsel explained that he "had a pretty good idea of what she was going to testify to, and it wasn't going to be very favorable to [the Petitioner]." Trial Counsel said that he could not remember whether he knew that Ms. Condra would testify that she saw the Petitioner and the victim in the bathroom together one night.

Trial Counsel recalled that Ms. Spada testified that, although her physical examination of the victim revealed no indication of vaginal or anal penetration, she could not refute the victim's claims of sexual abuse. Trial Counsel said that he had previously cross-examined Ms. Spada in many other cases but that the Petitioner's trial "was the first time [he] had ever

heard her say that." Trial Counsel stated that he did not recall whether he spoke to Ms. Spada via telephone during his preparation for the Petitioner's trial.

Trial Counsel could not remember specific details about any plea offers he conveyed to the Petitioner. He said that his normal practice, when informing his clients of plea offers, is to discuss the elements of the offense and range of punishment. He stated that he usually summarizes the expected testimony and proof during one of his initial meetings with his clients.

Taffy Wilson testified that, in September 2001, she worked as a forensic interviewer at the Children's Advocacy Center in Hamilton County. She recalled that she interviewed the victim and prepared a report about the interview. Ms. Wilson asked the victim if she knew why she was talking with her, and the victim replied, "Because of Bobby and Wayne." The victim later explained that Bobby was her mother's boyfriend and that Wayne was the "[p]erson mom first married." When asked if she knew her father's name, the victim answered, "I don't have a father." The victim told Ms. Wilson that Wayne made her perform oral sex on him when she was five years old. Ms. Wilson testified that, in her experience as a child abuse investigator, she found the victim to be a credible witness.

Dana Morrison testified that, in late 2000, she worked as a case manager at the Department of Children's Services. She said she interviewed the victim and, although she did not remember specific details about the interview, she remembered that she found the victim to be credible.

The post-conviction court denied relief, and this appeal followed.

**Analysis**

The Petitioner claims that he was denied effective assistance of counsel because Trial Counsel: (a) failed to adequately meet with him prior to the trial and investigate his case; (b) failed to adequately cross-examine the victim, the victim's brother, and the victim's mother; and (c) failed to adequately convey the State's plea offer such that the Petitioner could make an informed and knowledgeable decision. Additionally, the Petitioner contends that the cumulative effect of Trial Counsel's alleged deficiencies amounted to ineffective assistance of counsel.

To sustain a petition for post-conviction relief, a petitioner must prove his or her factual allegations by clear and convincing evidence at an evidentiary hearing. See Tenn. Code Ann. § 40-30-110(f); Momon v. State, 18 S.W.3d 152, 156 (Tenn. 1999). Upon review, this Court will not reweigh or re-evaluate the evidence below; all questions concerning the credibility of witnesses, the weight and value to be given their testimony, and

the factual issues raised by the evidence are to be resolved by the post-conviction judge, not the appellate courts.  See Momon, 18 S.W.3d at 156; Henley v. State, 960 S.W.2d 572, 578-79 (Tenn. 1997).  The post-conviction judge's findings of fact on a petition for post-conviction relief are afforded the weight of a jury verdict and are conclusive on appeal unless the evidence preponderates against those findings.  See Momon, 18 S.W.3d at 156; Henley, 960 S.W.2d at 578.

The Sixth Amendment to the United States Constitution and article I, section 9 of the Tennessee Constitution guarantee a criminal defendant the right to representation by counsel. State v. Burns, 6 S.W.3d 453, 461 (Tenn. 1999); Baxter v. Rose, 523 S.W.2d 930, 936 (Tenn. 1975).  Both the United States Supreme Court and the Tennessee Supreme Court have recognized that the right to such representation includes the right to "reasonably effective" assistance, that is, within the range of competence demanded of attorneys in criminal cases. Strickland v. Washington, 466 U.S. 668, 687 (1984); Burns, 6 S.W.3d at 461; Baxter, 523 S.W.2d at 936.

A lawyer's assistance to his or her client is ineffective if the lawyer's conduct "so undermined the proper functioning of the adversarial process that the trial cannot be relied on as having produced a just result."  Strickland, 466 U.S. at 686.  This overall standard is comprised of two components: deficient performance by the defendant's lawyer and actual prejudice to the defense caused by the deficient performance.  Id. at 687; Burns, 6 S.W.3d at 461.  To demonstrate prejudice, a defendant must show "a reasonable probability that but for counsel's unprofessional errors, the result of the proceeding would have been different." Strickland, 466 U.S. at 694.  The defendant bears the burden of establishing both of these components by clear and convincing evidence.  Tenn. Code Ann. § 40-30-110(f); Burns, 6 S.W.3d at 461.  The defendant's failure to prove either deficiency or prejudice is a sufficient basis upon which to deny relief on an ineffective assistance of counsel claim.  Burns, 6 S.W.3d at 461; Goad v. State, 938 S.W.2d 363, 370 (Tenn. 1996).

In evaluating a lawyer's performance, the reviewing court uses an objective standard of "reasonableness."  Strickland, 466 U.S. at 688; Burns, 6 S.W.3d at 462.  The reviewing court must be highly deferential to counsel's choices "and should indulge a strong presumption that counsel's conduct falls within the wide range of reasonable professional assistance."  Burns, 6 S.W.3d at 462; see also Strickland, 466 U.S. at 689.  The court should not use the benefit of hindsight to second-guess trial strategy or to criticize counsel's tactics, see Hellard v. State, 629 S.W.2d 4, 9 (Tenn. 1982), and counsel's alleged errors should be judged in light of all the facts and circumstances as of the time they were made, see Strickland, 466 U.S. at 690; Hicks v. State, 983 S.W.2d 240, 246 (Tenn. Crim. App. 1998).

A trial court's determination of an ineffective assistance of counsel claim presents a mixed question of law and fact on appeal. Fields v. State, 40 S.W.3d 450, 458 (Tenn. 2001). This Court reviews the trial court's findings of fact with regard to the effectiveness of counsel under a de novo standard, accompanied with a presumption that those findings are correct unless the preponderance of the evidence is otherwise. Id. "However, a trial court's conclusions of law—such as whether counsel's performance was deficient or whether that deficiency was prejudicial—are reviewed under a purely de novo standard, with no presumption of correctness given to the trial court's conclusions." Id. (emphasis in original).

### A. Investigation and Trial Preparation

The Petitioner contends that Trial Counsel was deficient for failing to conduct an adequate pre-trial investigation and failing to interview key witnesses—Ms. Newman, Ms. Condra, and Ms. Spada—prior to the trial.

Trial Counsel testified that he met with the Petitioner "frequently" while he was incarcerated. However, Trial Counsel recalled that, after the Petitioner was released on bond, he did not see the Petitioner as much as he would have liked because the Petitioner made excuses regarding why he could not meet with Trial Counsel to prepare for the trial. In addition to meeting with the Petitioner, Trial Counsel interviewed the victim and her brother, interviewed the Petitioner's ex-wife, went to the apartment complex where the sexual misconduct allegedly occurred, reviewed Department of Children's Services reports, and reviewed the transcript of Ms. Condra's parental rights termination hearing. The post-conviction court found that Trial Counsel "discussed all of this information with the [P]etitioner prior to trial."

Regarding the Petitioner's argument that Trial Counsel should have interviewed Ms. Newman, we note that she was not presented as a witness during the post-conviction hearing and that the Petitioner has therefore failed to show by clear and convincing evidence that Trial Counsel was deficient for failing to interview her. In Black v. State, this Court stated, "When a petitioner contends that trial counsel failed to discover, interview, or present witnesses in support of his defense, these witnesses should be presented by the petitioner at the evidentiary hearing." 794 S.W.2d 752, 757 (Tenn. Crim. App. 1990); see also Owens v. State, 13 S.W.3d 742, 756 (Tenn. Crim. App. 1999) ("[P]roof of deficient representation by omission requires more than a speculative showing of a lost potential benefit."). Additionally, Trial Counsel testified that he did not remember the Petitioner informing him that he had information indicating that Ms. Newman told the victim and her brother that she would put them in foster care if they did not say something bad about the Petitioner.

Next, although he did not interview Ms. Condra, Trial Counsel testified that he "had a pretty good idea of what she was going to testify to" and that he used the transcript from

her parental rights termination hearing to impeach her credibility. Finally, Trial Counsel could not remember if he interviewed Ms. Spada via telephone in preparation for the Petitioner's trial, but he knew that had reviewed her report. He recalled that the report was favorable to his client, because Ms. Spada did not find any evidence of vaginal or anal penetration when she examined the victim. We agree with the post-conviction court that the Petitioner failed to show by clear and convincing evidence that Trial Counsel's performance was deficient. The Petitioner is not entitled to relief on this issue.

### B. Cross-Examinations

The Petitioner contends that he was prejudiced by Trial Counsel's failure to adequately and effectively cross-examine the victim, her brother, and Ms. Condra.

### i. The Victim

The Petitioner argues that Trial Counsel was ineffective because he failed to impeach the victim's credibility by asking her about the prior allegations of sexual abuse she had made against her biological father.

The victim was nine years old at the time of the trial. Trial Counsel testified that it was his trial strategy to engage the victim in a conversational style of cross-examination, rather than blatantly accuse her of lying. In particular, Trial Counsel recalled that he was trying not to cause the victim to cry in front of the jury. Although he knew that the victim had also made accusations of sexual abuse against her father, Trial Counsel decided not to question the victim about her prior allegations because doing so would open the door to allow the State to question the victim about other statements included in the forensic interviewer's report. Trial Counsel was especially worried about the introduction of one part of the report, in which the victim compared the penises of the Petitioner and her father.

In its order denying relief, the post-conviction court noted that Trial Counsel "made a tactical decision not to delve into the prior allegations of abuse of the victim by her biological father citing well-founded concerns that the jury could draw negative conclusions from such an approach." We agree with the post-conviction court that Trial Counsel's reasonable trial tactic should not be second-guessed. The Petitioner is not entitled to relief on this issue.

### ii. The Victim's Brother

Next, the Petitioner argues that Trial Counsel should have cross-examined the victim's brother more extensively about a "serious whipping" the Petitioner had given him and whether the whipping was the catalyst for the allegations that the Petitioner raped his sister.

The post-conviction court summarized the relevant testimony during the Petitioner's trial and post-conviction hearing as follows:

> At the post-conviction evidentiary hearing, [Trial Counsel] testified that one of the possible defense arguments was that the allegations of sexual abuse were raised after the [Petitioner] whipped [the victim's brother]. [Trial Counsel] was well aware of the "whipping" as it was the subject of another indictment against the [Petitioner], was very familiar with the facts of the event, and had discussed it with the [Petitioner] prior to trial. In opening statement [Trial Counsel] encouraged jurors to listen for "possible motivations" in the proof.
>
> The answers given on cross-examination by [the victim and her brother] at trial in response to questions did not support this theory but [Trial Counsel] was able to establish through Department of Children's Services witness Kelly Buttram that the allegations were made against the [Petitioner] only after DCS became involved after the "whipping" on August 31. He was also able to establish that it was only then that the children told about the sexual abuse allegations against the Petitioner.

After our review, we agree with the post-conviction court that the Petitioner has failed to show that Trial Counsel was deficient. The Petitioner is not entitled to relief on this issue.

### iii. Ms. Condra

Finally, the Petitioner argues that Trial Counsel should have cross-examined Ms. Condra about the letters she sent to the Petitioner while he was incarcerated.

Trial Counsel testified that, rather than impeaching Ms. Condra's credibility with the undated letters, he decided to use Ms. Condra's prior testimony in her parental rights termination hearing. He stated that he felt her prior testimony was a better tool for impeachment than the letters. Indeed, our examination of the trial transcript reveals that Trial Counsel extensively questioned Ms. Condra about inconsistencies between her testimony during the Petitioner's trial and her testimony during the parental rights termination hearing. Notably, Trial Counsel's questions made the jury aware that Ms. Condra had testified under oath, just eight months prior to the Petitioner's trial, that the victim had never complained about any sexual misconduct by the Petitioner and that Ms. Condra did not know of or witness any sexual misconduct by the Petitioner. We conclude that the post-conviction court did not err when it denied relief and found that Trial Counsel's trial strategy regarding Ms. Condra's cross-examination should not be second-guessed. The Petitioner is not entitled to relief on this issue.

## C.  Plea Agreement Discussions

The Petitioner contends that Trial Counsel was deficient because he failed to "adequately convey the State's plea offer to Petitioner such that he could make an informed and knowledgeable decision."

Trial Counsel did not remember the details of any plea offers made by the State in the Petitioner's case.  However, he stated that his normal practice is to summarize expected testimony during one of his initial meetings with his clients and that he discusses the elements of the offense and range of punishment when he informs his clients of a plea offer.  Additionally, we note that the post-conviction court credited Trial Counsel's testimony and found that Trial Counsel discussed the results of his investigation with the Petitioner prior to the trial.

In his brief, the Petitioner states that, during the post-conviction hearing, he "specifically stated th[at] he would have accepted the State's plea offer had trial counsel informed him that [Ms.] Condra would testify against him, that Nurse Spada's testimony did not refute the allegations, and that the State could elect to prosecute Petitioner on oral penetration alone."  However, the Petitioner does not provide citations to the record to support his assertion that he testified "he would have" accepted the State's plea offer had Trial Counsel informed him of these things.  Moreover, our review of the record does not reveal the Petitioner provided such testimony.  When asked whether he would have accepted the plea offer if he knew the State could elect only an allegation of oral sex, the Petitioner replied, "It would have made me think."  Additionally, the Petitioner acknowledged that he did not base his decision to reject the plea offer on Ms. Condra's testimony, but rather on the facts that he was innocent and that he did not think he would be found guilty.

In its order denying relief, the post-conviction court found as follows:

> It was apparent from the proof and testimony that the [Petitioner] had no intention of accepting a plea agreement and thought that he would not be found guilty.  The [Petitioner] never indicated to his attorney that he had reconsidered the [S]tate's plea offer and decided to accept the offer.  The [Petitioner] indicated at the post conviction proceeding he might have accepted the plea offer, " . . . if he had known how it would turn out . . . ."

We conclude that the post-conviction court did not err when denying relief on this issue because the Petitioner has failed to show by clear and convincing evidence that Trial Counsel's performance was deficient with regard to discussing a potential plea agreement. The Petitioner is not entitled to relief on this issue.

**D. Cumulative Effect**

Finally, the Petitioner asserts that "the collective and cumulative effect of each of the above deficiencies denied Petitioner the constitutional right to the effective assistance of counsel." However, as we have found no deficiencies in Trial Counsel's performance, we conclude that the Petitioner is not entitled to relief.

## Conclusion

Based on the foregoing authorities and reasoning, we affirm the denial of post-conviction relief.

_____
DAVID H. WELLES, JUDGE